**NATIONAL STUDENT ASSOCIATION, Inc., et al., Appellants,**

v.

**Lewis B. HERSHEY, Appellee.**

No. 21903.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 3, 1968.

Decided June 6, 1969.

Miss Harriet Van Tassel, Newark, N. J., with whom Messrs. Lawrence Speiser, Washington, D. C., and William M. Kunstler, New York City, were on the brief, for appellants.

Mr. Irwin Goldbloom, Attorney, Department of Justice, with whom Asst. Atty. Gen. Edwin L. Weisl, Jr., at the time the record was filed, Messrs. David G. Bress, U. S. Atty., at the time the record was filed, and Morton Hollander, Attorney, Department of Justice, were on the brief, for appellee.

Mr. Oliver Ellis Stone, Washington, D. C., filed a brief on behalf of American Friends Service Committee, Inc., as amicus curiae, urging reversal.

Before BAZELON, Chief Judge, McGOW-AN and ROBINSON, Circuit Judges.

BAZELON, Chief Judge:

This suit challenges (1) the celebrated "Hershey directive" of October, 1967,[1] which threatened war protesters with loss of their draft deferments and in some cases with immediate induction into the armed forces as delinquents, and (2) the delinquency regulations[2]

promulgated under the Military Selective Service Act of 1967.[3] The plaintiffs are fifteen college student-body presidents, the president of the University Christian Movement, and three national student organizations, all of whom sue both in their own behalf and in a representative capacity.

The so-called Hershey directive is in fact a letter, together with a Local Board Memorandum, from the Selective Service Director, General Hershey, addressed to all members of the Selective Service System. In essence, the letter asserts that since "any action" violative of the Selective Service Act, regulations, or "related processes" is patently contrary to the national interest, registrants who commit such actions "should be denied deferment in the national interest." In addition, it condemns "illegal activity which interferes with recruiting or causes refusal of [military] duty" as "not by any stretch of the imagination" compatible with the national interest. It goes on to declare that

Demonstrations, when they become illegal, have produced and will continue to produce much evidence that relates to the basis for classification and, in some instances, even to violation of the act and regulations. Any material of this nature received in national headquarters or any other segment of the system should be sent to state directors for forwarding to appropriate local boards for their consideration.

A local board, upon receipt of this information, may reopen the classification of the registrant, classify him anew, and if evidence of violation of the act and regulations is established * * *, also * * * declare the registrant to be a delinquent and * * process him accordingly. This should include all registrants with remaining liability up to 35 years of age.

---

1. Text published in The New York Times, Nov. 9, 1967.

2. 32 C.F.R. Part 1642 (1968).

3. 50 U.S.C.App. §§ 451–473 (1964), as amended, 81 Stat. 100–105 (1967), 50 U.S.C.App. §§ 451–467 (Supp. III, 1965–67).

The letter concludes by urging

> all elements of the Selective Service System * * * to expedite responsive classification and the processing of delinquents to the greatest possible extent consistent with sound procedure.

Local Board Memorandum No. 85, apparently attached to this letter, instructs local boards to forward any abandoned or mutilated draft card they might receive to the owner's draft board, and informs the recipient board how it should go about declaring the owner delinquent.

The delinquency regulations provide in pertinent part that

> Whenever a registrant has failed to perform any duty or duties required of him under the selective service law [other than certain designated duties] * * *, the local board may declare him to be a delinquent.

32 C.F.R. § 1642.4(a) (1968); a delinquent registrant may be classified 1-A and, if he is, should be moved to the head of the induction list. 32 C.F.R. §§ 1642.-12, 1642.13, 1631.7 (1968).

The complaint alleges that Congress has in no way deputized selective service members to help courts and prosecutors enforce the law; their business, it says, is to determine a registrant's eligibility for statutorily defined deferments or exemptions according to such criteria as Congress has established, not according to their own or their Director's view of whether a registrant's every act is "in support of the national interest." If Congress did intend draft boards to exercise a law enforcement function, the complaint asserts that such authorization necessarily abridges the freedoms of speech and assembly and imposes punishment without any of the trappings of criminal due process. Accordingly, appellants seek a declaratory judgment voiding the Hershey directive and the delinquency regulations and an injunction against the enforcement of either.

On cross motions for summary judgment, the District Court dismissed the complaint for lack of jurisdiction over the subject matter. However, we think appellants were entitled to partial relief in accordance with the following conclusions:

I. Section 10(b) (3) of the Military Selective Service Act of 1967, which prohibits judicial review of a draft board's "classification or processing of any registrant," is not a bar to this suit (*infra*, pp. 1107–1109).

II. A. An allegation that the general threat of enforcement of a law or official policy chills the exercise of protected First Amendment freedoms does not automatically establish the existence of a justiciable case or controversy, but in some circumstances such an allegation may be sufficient (*infra*, pp. 1110–1121).

B. There is no justiciable case or controversy with respect to (1) the delinquency regulations or that part of the Hershey directive which purports to construe them (*infra*, pp. 1116–1117), or (2) Local Board Memorandum No. 85 (*infra*, p. 1117), but there is a justiciable controversy with respect to (3) the remaining portion of the directive, envisaging reclassification on account of protest activity which is not within the scope of the delinquency regulations (*infra*, pp. 1117–1119).

C. The appellant organizations, as student political associations substantially committed to anti-war or anti-draft activities, have standing to bring this suit, since they and their members are vulnerable to the directive's chilling effect on protected protest (*infra*, pp. 1119–1120).

III. That portion of the Hershey directive which purports to authorize draft boards, independently of the delinquency regulations, to deny deferments or exemptions on the basis of illegal protest activity is itself unauthorized, and the local boards have no such authority (*infra*, pp. 1121–1124).

## I. SECTION 10(b) (3)

Section 10(b) (3) of the Military Selective Service Act provides in part that

no judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution \* \* \* after the registrant has responded either affirmatively or negatively to an order to report for induction \* \*.

50 U.S.C. App. § 460(b) (3) (Supp. III, 1965–67). Appellants carefully note that they are neither seeking "review \* \* \* of the classification or processing of any registrant," nor contesting any classification action of "local boards, appeal boards, or the President." Instead, they have mounted a direct attack on administrative regulations and an official policy, and with one exception [4] none of them even claims to have been classified or processed by a draft board.

Since appellants' complaint does not fall within the literal terms of Section 10(b) (3), the question is whether it is encompassed by the section's rationale. The legislative history [5] discloses three interrelated purposes to be served by this provision: (1) to reaffirm existing law; (2) to reverse recent court holdings apparently disregarding that law; and (3) to prevent "litigious interruption of military manpower procurement." [6] We conclude that none of these purposes precludes prompt judicial review of the legality of announced criteria for classification, provided such review is otherwise proper.

(1) The "existing law" which Congress approved is the doctrine that a draft registrant must exhaust his internal administrative remedies to the point of reporting for induction before he can challenge the legality of his classification or processing in court.[7] This doctrine rests on the provision ascribing "finality" to local board decisions on such matters,[8] and thus does

---

4. See note 47, infra.

5. Report of the Committee on Armed Services of the House of Representatives on the Military Selective Service Act of 1967, H.R.Rep.No. 267, 90th Cong., 1st Sess. 7, 30–31, 46 (1967) ; Report of the Committee on Armed Services of the Senate, Amending and Extending the Draft Law, S.Rep.No. 209, 90th Cong., 1st Sess. 10 (1967).

6. S.Rep.No. 209, supra note 5, at 10.

7. The House Report says the purpose of Section 10(b)(3) is to

reenunciate . . . the principle already in existing law that the courts cannot review the classification action of the Selective Service System until after a registrant has been ordered to report for induction and has responded either affirmatively or negatively to such an order. \* \* \*

H.R.Rep.No. 267, supra note 5, at 7, U.S.Code Cong. & Admin.News 1967, p. 1349. Elaborating, it asserts:

The committee was disturbed by the apparent inclination of some courts to review the classification action of local or appeal boards before the registrant had exhausted his administrative remedies. Existing law quite clearly precludes such a judicial review until after

a registrant has been ordered to report for induction and has responded either affirmatively or negatively to such an order. In view of this inclination of the courts to prematurely inquire into the classification action of local boards, the committee has rewritten this provision of the law so as to more clearly enunciate this principle.

Id. at 30–31, U.S.Code Cong. & Admin. News 1967, p. 1333.

8. Section 460(b) (3) of the amended Act provides in part that local draft boards shall have the power

to hear and determine, subject to the right of appeal to the appeal boards \* \* \* all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this title \* \* \*,

and directs that

[t]he decisions of such local board[s] shall be final, except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe.

This provision is retained from the prior law, under which the Supreme Court held it to bar preinduction judicial review of a classification decision. Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 802 (1944) ; Estep v. United

not apply to litigation involving no challenge to local board actions. Such litigation may raise questions of general law, to be considered *infra*, concerning the presence of a justiciable case or controversy, but it does not affront the finality provision of the Selective Service Act.[9]

(2) Congress did not say which court holdings it sought to expunge by way of Section 10(b) (3),[10] but appellee refers us to Wolff v. Selective Service Local Board No. 16,[11] Townsend v. Zimmerman,[12] and Ex parte Fabiani.[13] In each of these cases, the court reviewed the classification action of Selective Service boards even though the registrant had failed to exhaust his administrative remedies. The language of Section 10(b) (3) can readily be construed to overrule these cases without operating as a bar to the instant suit.

 Moreover, it may be that Congress could not overrule the *Wolff* decision without running afoul of the First Amendment. In *Wolff*, the ap-

pellant registrants had been reclassified as delinquents because of their participation in a draft board sit-in demonstration protesting the war in Vietnam. The Second Circuit Court of Appeals felt obliged to "intervene at once" in the processing of these registrants in order to prevent irreparable constitutional injury, because

> the effect of the [challenged] reclassification * * * [was] immediately to curtail the exercise of First Amendment rights * * *.

372 F.2d 817, 823–24. Appellants conclude that since the Hershey directive similarly threatens to inhibit protest protected by the First Amendment, Section 10(b) (3) could not constitutionally bar their suit. In Clark v. Gabriel,[14] the Supreme Court recently held Section 10(b) (3) constitutional as applied to preclude interlocutory review of a draft board's determination that a registrant did not qualify as a conscientious objector. However, as Justice Douglas's concurring opinion makes clear, this de-

States, 327 U.S. 114, 66 S.Ct. 423, 90 L. Ed. 567 (1946).

The Senate Armed Services Committee, which *did not originally propose* new legislation on this point, specifically noted that

Section 10(b) of the Universal Military Training and Service Act [as the draft law was known before the 1967 amendments] makes decisions of local boards final, subject to the right of appeal to State and national appeal boards. * * * The Committee attaches much importance to the finality provisions and reemphasizes the original intent that judicial review of classifications should not occur until after the registrant's administrative remedies have been exhausted and the registrant presents himself for induction.

S.Rep.No. 209, *supra* note 5, at 10.

9. A further provision of Section 10(b)(3) also expressly endorses the holding in *Estep*, *supra* note 8, that

[t]he provision making the decision of the local boards "final" means * * * that Congress chose not to give administrative action under this Act the customary scope of judicial review which obtains under other statutes. It means that the courts are not to weigh the evi-

dence to determine whether the classification made by the local boards was justified. The decisions of the local boards made in conformity with the regulations are final even though they may be erroneous.

327 U.S. at 122, 66 S.Ct. at 427. Like the exhaustion doctrine, this construction of the finality provision does not touch the issue at bar, which involves no review of the evidence supporting any discretionary act.

10. The Senate Committee referred to "several recent cases" in which "district courts have been brought into selective service processing prematurely." S.Rep.No. 209, *supra* note 5, at 10. The House Committee said only that it was disturbed by the apparent inclination "of some courts" to review the classification action of local or appeal boards before the registrant had exhausted his administrative remedies. H.R.Rep.No. 267, *supra* note 5, at 30.

11. 372 F.2d 817 (2 Cir. 1967).

12. 237 F.2d 376 (6 Cir. 1956).

13. 105 F.Supp. 139 (E.D.Pa.1952).

14. 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968).

cision does not remove the doubts raised by *Wolff* as to whether the Section could preclude preinduction review of a classification ostensibly based on protected protest activities,[15] and these doubts argue in favor of a narrow construction in the instant case.

(3) Finally, appellants' suit does not constitute

> the kind of "litigious interruptions of procedures to provide necessary military manpower" * * * which Congress sought to prevent when it enacted § 10(b) (3).

*Clark v. Gabriel, supra,* 393 U.S. at 258–259, 89 S.Ct. at 426. Congress and the courts have been understandably concerned to avoid serious interference with efficient recruitment.[16] The ex-

haustion doctrine codified in Section 10 (b) (3) protects against the danger that multitudes of draftees can delay their induction by ill-founded judicial challenges. The inescapable price of that protection is the possibility that some well-founded challenges must be postponed or perhaps abandoned. But we cannot assume that Congress sought deliberately to insulate illegal or unconstitutional practices from judicial review as an end in itself.[17] Appellants' suit, which does not attack any specific classification and thus does not interrupt the recruitment process, is nicely calculated to interfere—if at all—only with those practices which are found to be unlawful. We do not think it is barred by Section 10(b) (3).[18]

---

15. Justice Douglas concurred because, as the majority had observed, "the question whether the registrant should be classified as a conscientious objector turns on the weight and credibility of the testimony." 393 U.S. at 259, 89 S.Ct. at 426. He would, however,

> take a different view if this were a case where a registrant was moved from a CO (conscientious objector) classification to I–A because he made a speech, unpopular with the Board.

*Id.* at 260, 89 S.Ct. at 427.

16. As the Senate Armed Services Committee observed, the finality provision

> was enacted in recognition that if litigious interruption of military manpower procurement is to be avoided, a registrant should be required to exhaust his administrative remedies and to present himself for induction or assignment before any judicial determination of the legality of a classification.

S.Rep.No. 209, *supra* note 5, at 10. *See also* the comments of Senator Russell in 113 Cong.Rec. 8052 (June 12, 1967).

17. The invalidation of a particular draft board practice would, of course, interfere with subsequent processing under that practice. While we do not suppose that Congress wished to perpetuate unlawful practices, it might conceivably have been concerned about possible disruptions of lawful practices caused by mistaken lower court judgments. Pending reversal on appeal, such erroneous judicial invalidations could interfere with the processing of registrants. However, to preclude this possibility, Congress would have to bar *post-*

induction review of selective service policies as well as pre-induction challenges, since an invalidation made in a post-induction suit will have precisely the same effect as if it were made prior to induction. Congress did not and almost certainly could not forbid all review of the legality of official classification criteria. Thus, it seems clear that the proscribed "litigious interruptions" are those which threaten delay of inductions pending review of challenges to presumptively valid individual classifications.

18. Since we conclude *infra* that the deferment policy of the Hershey directive is, in effect, "basically lawless," appellants' challenge to at least that much of the directive may also escape the bar of Section 10(b)(3) under the narrow holding of Oestereich v. Selective Service System Local Board No. 11, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). It may be, as appellants contend, that the delinquency regulations themselves—held lawless under *Oestereich* when in conflict with express statutory provisions—are likewise completely unauthorized and thus subject to challenge under the *Oestereich* rationale. In view of our holding that Section 10(b)(3) is not a bar in any event, we need not decide this question.

In addition, under the view taken in Mr. Justice Harlan's concurring opinion in *Oestereich*, Section 10(b)(3) would bar only those suits which seek review of "discretionary, factual, and mixed law-fact determinations" of a Selective Service Board, and not those which allege "that the very statutes or regulations which the board administers are facially invalid."

## II. THE CASE OR CONTROVERSY REQUIRE-MENT.

Since this suit does not challenge the "classification or processing of any registrant," there is some doubt as to whether it presents a justiciable case or controversy within the meaning of Article III of the Constitution. Having scaled the statutory barrier, appellants find themselves obliged to argue that the chilling effect of the Hershey directive and the delinquency regulations on the exercise of their First Amendment rights in itself renders their suit justiciable. Accordingly, we must determine whether (A) a suit by persons claiming only that they are subject to such a chill can ever be justiciable, and (B) whether, if so, we may adjudicate such a suit against the Hershey directive and the delinquency regulations. If we may, there will then remain the question of (C) whether the present appellants are in fact vulnerable to the chill they complain of.

### A. *A Chilling Effect as Giving Rise to a Case or Controversy.*

 As the Supreme Court has only recently reiterated:

"The federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions,' are requisite. * * *" * * * "The difference between an abstract ques-

tion and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959, 22 L.Ed.2d 113 (1969).

 Two general principles relevant in determining whether a dispute asserted in a declaratory judgment action has "sufficient immediacy and reality" are reasonably clear. The first is that a plaintiff need not invariably wait until he has been successfully prosecuted, dismissed, denied a license, or otherwise directly subjected to the force of a law or policy before he may challenge it in court.[19] The second is that the mere existence of a statute, regulation, or articulated policy is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms.[20]

393 U.S. at 240, 89 S.Ct. at 417. This construction does not appear to be inconsistent with the majority opinion, which expressly notes that conduct which is in fact "basically lawless" may be challenged because "there is no exercise of discretion by a Board in evaluating evidence and in determining whether a claimed exemption is deserved." *Id.* at 238, 89 S. Ct. at 416. Under the Harlan rule, Section 10(b)(3) would have no application to appellants' suit, which challenges the Hershey directive and the delinquency regulations on their face.

19. Evers v. Dwyer, 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958); Railway Mail Association v. Corsi, 326 U.S. 88,

65 S.Ct. 1483, 89 L.Ed. 2072 (1945); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Reed Enterprises v. Corcoran, 122 U.S. App.D.C. 387, 391–392, 354 F.2d 519, 523–524 (1965). *Cf.* Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

20. United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 460–462, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Watson v. Buck, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); Lion Manufacturing Corp. v. Kennedy, 117 U.S.App.D.C. 367, 330 F.2d 833 (1964).

The leading case applying these two principles is United Public Workers v. Mitchell,[21] in which various federal employees requested the Court to declare unconstitutional the provision of the Hatch Act forbidding them to take "any active part in political management or in political campaigns." 330 U.S. 75, 78, 67 S.Ct. 556, 558 (1947). The Court spread the justiciability question along a continuum ranging between "a general threat by officials to enforce those laws which they are charged to administer" and a "direct threat of punishment against a named [party] * * * for a completed act." Suits predicated on threats nearer the "general" pole are not justiciable; suits nearer the direct pole are. *Id.* at 88, 67 S.Ct. at 564.

Accordingly, the Court refused to entertain the suits of employees who alleged only that they wished to engage in political activities of the kind clearly prohibited by the terms of the Act, saying:

> As these appellants are classified employees, they have a right superior to the generality of citizens * * *, but the facts of their personal interest in their civil rights, of the general threat of possible interference with those rights by the Civil Service Commission under its rules, if specified things are done by appellants, does not make [sic] a justiciable case or controversy.

*Id.*, at 89, 67 S.Ct. at 564. In contrast, the Court found a justiciable controversy in the complaint of an employee who had engaged in the prohibited conduct and who had pending against him an order of removal for this violation.

At first blush appellants' suit appears to rely on a prototype of the "general threat" for which *Mitchell* denies justiciability. The question is to what extent the fact that the mere existence of the challenged policies may exert a First Amendment chilling effect makes this case an exception to the *Mitchell* rule.

It is noteworthy that a suit brought before a challenged law has actually been applied to the plaintiff potentially involves two contingencies: whether the plaintiff will in fact act contrary to the apparent command of the law, and whether the law will be applied to him if he does. In some cases, "general threats" do not confer justiciability because it is not clear that the law's threat actually applies to the plaintiff or his conduct.[22] In others, however, as in *Mitchell, supra,* the generality of the threat does not significantly detract from its certainty. There, the difficulty must be the possibility that, for all his protestations, the plaintiff may not break the law after all.[23] In the typical case, federal courts ignore statements of intent and wait for the accomplished fact.[24]

The peculiar feature of suits alleging a First Amendment chilling effect, however, is that if the allegation is correct, immediate and real injury is done to the plaintiff's interests if he *does not* speak or act as he says he wants to. In addition, this injury may result from the threat of enforcement itself, even if that threat never materializes.[25] Accordingly, it is possible that in such cases courts may rely on a credible threat of enforcement and plausible allegations of intent or desire to engage in the threatened

21. *Supra* note 20.

22. *E. g.,* United States v. Fruehauf, 365 U.S. 146, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961); Alabama State Federation of Labor v. McAdory, *supra* note 20.

23. Or, if he does break it, may not do so in a way that raises the constitutional issue he is attempting to adjudicate.

24. In *Mitchell,* the Court said
A hypothetical threat is not enough. We can only speculate as to the kinds

of political activity the appellants desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication. 330 U.S. at 90, 67 S.Ct. at 564.

25. Thus, the threat itself may constitute "actual interference" with the plaintiff's rights. United Public Workers v. Mitchell, *supra* note 20, at 90, 67 S.Ct. 556.

activities as sufficient predicates for justiciability.

The potential chilling effect of vague and overbroad statutes has overcome many of the discretionary rules of judicial abstention which fortify the case or controversy requirement,[26] including the federal abstention doctrine, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); the exhaustion of remedies doctrine, Wolff v. Selective Service Local Board No. 16, *supra*; and the denial of standing to raise the rights of third parties, United States v. Raines, 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed. 2d 524 (1960); NAACP v. Button, 371 U.S. 415, 432–433, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963); Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 84 L. Ed. 1093 (1940); *cf.* Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Although the Supreme Court has yet to trace the implications of these decisions for the case or controversy requirement, in *Wolff* the Second Circuit Court of Appeals invoked *Dombrowski* to support its finding of a justiciable controversy predicated on a First Amendment chill.

In *Dombrowski,* the Supreme Court enjoined a state criminal prosecution because the threat of prosecution impaired the appellants' freedom of expression. The Wolff appellants contested the validity of their reclassification by a local draft board. The court said that ordinarily such a claim would not be ripe for adjudication until a registrant had received and responded to an induction order, since reclassification itself is not a sufficient injury.[27] However, it held this rule inapplicable where the reclassification resulted from the registrants' protest activity, for

> there can be no doubt that the threat of receiving a I–A classification upon voicing dissent from our national policies has an immediate impact on the behavior of appellants and others similarly situated.

372 F.2d at 823. Since the appellants had in fact been reclassified, and since the court found that "no purpose would be served by relegating [them] * * * to their administrative remedies," *id.* at 825, *Wolff* does not stand for the broad proposition that any established governmental policy which has a chilling effect may without more create a justiciable controversy. But its language and its express reliance on the *Dombrowski* rationale would, if carried to their logical conclusion, sustain that contention.[28]

---

26. The Supreme Court has found the policies underlying the case or controversy requirement so salutary that it has implemented them by numerous additional non-constitutional rules of justiciability which guard the approaches to the constitutional citadel. *See* Flast v. Cohen, 392 U.S. 83, 91–97, 88 S.Ct. 1942 (1968); Rescue Army v. Municipal Court, 331 U.S. 549, 568–575, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (opinion of Brandeis, J.) (1936). As a result, it is often difficult to ascertain where the outlying fortifications end and the citadel begins. Flast v. Cohen, *supra*, at 97, 88 S.Ct. 1942; Rescue Army v. Municipal Court, *supra* at 570–571, 67 S.Ct. 1409.

27. It is unclear whether the court thought this rule involved constitutional considerations, or a discretionary ripeness doctrine, or only the peculiar provisions of the Selective Service Act. It discusses the rule under the general heading of "justiciability," 372 F.2d at 823–825, and refers on one occasion to the presence vel non of a "justiciable controversy," *id.* at 823, but does not mention Article III. Arguably, the constitutional requirements have been satisfied when a complaining registrant has been reclassified, and the remaining requirements of exhaustion of administrative remedies result from a judicial policy of encouraging administrative bodies to correct their own errors and from the finality provision of the Selective Service Act, *supra* note 8. Such discretionary rules might be readily displaced by First Amendment considerations. The thrust of the court's opinion, however, is that reclassification is not a sufficient injury to confer justiciability, but that a First Amendment chilling effect is.

28. In *Dombrowski,* where the appellants had been subjected to arrest, searches and seizures, and destruction of records, where there had been repeated official announce-

Thus, it appears that suits alleging injury in the form of a chilling effect may be more readily justiciable than comparable suits not so affected with a First Amendment interest.[29] Nonetheless, for a number of reasons we are not

ments of intent to apply the statute to them, and where a grand jury had been summoned to return indictments, no issue was raised as to the presence of a justiciable controversy under Article III. The issue was rather whether the federal courts had to abstain pending the results of a state court criminal prosecution which might have narrowed the statute so as not to apply to the appellants. However, the *Wolff* court said:

> It has been held repeatedly that the mere threat of the imposition of unconstitutional sanctions will cause immediate and irreparable injury to the free exercise of rights as fragile and sensitive to suppression as the freedoms of speech and assembly and the right to vote. * * * Since it is the mere threat of unconstitutional sanctions which precipitates the injury, the courts must intervene at once to vindicate the threatened liberties.
>
> Dombrowski v. Pfister * * * is very much in point.

372 F.2d at 824. The *Dombrowski* court grounded its decision to intervene on the proposition that there could otherwise be no assurance of "adequate vindication of constitutional rights," because "a substantial loss or impairment of freedoms of expression" would occur if the appellants were obliged to await prosecution. 380 U.S. at 485–486, 85 S.Ct. at 1120. In essence, *Wolff* reads *Dombrowski* to say that a foreseeable First Amendment injury is irreparable and therefore warrants federal judicial relief.

29. In Reed Enterprises v. Corcoran, *supra* note 19, we distinguished our prior holding in Lion Manufacturing Corp. v. Kennedy, *supra* note 20, in part on the ground that

> *Lion* is not concerned with the protected area of First Amendment freedoms. Where the plaintiff complains of chills and threats in the protected First Amendment area, a court is more disposed to find that he is presenting a real and not an abstract controversy.

122 U.S.App.D.C. at 391, 354 F.2d at 523.

The recent case of Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956 (1969), is not to the contrary. There, the appellant sought to void on First Amendment grounds a statute forbidding distribution of anonymous political pamphlets in connection with public elections. He had been convicted of violating this statute during the 1964 congressional election campaign, but his conviction was subsequently overturned in the state court on non-constitutional grounds. The court read his complaint as alleging only that he wished to distribute such literature in any future campaign of the particular Congressman he had attacked in 1964. Since that Congressman had since been appointed to a 14-year term on the New York Supreme Court, the Court held that the appellant's complaint no longer alleged a "live grievance" and therefore did not present a justiciable controversy. The Court did not suggest that a First Amendment chilling effect could not present a justiciable controversy. Rather it held, in effect, that the complaint showed no likelihood of any chilling effect on the plaintiff at bar. And since he had no substantial interest of his own in obtaining an adjudication of the constitutionality of the statute, he had no standing to raise the interests of others.

That Golden v. Zwickler was intended to stand for no more than its exceedingly narrow holding is confirmed by the Court's decision in Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1, barely two months later. There, persons who had unsuccessfully sought a place on the ballot as independent presidential electors from the State of Illinois in the 1968 presidential election challenged the statute under which they had been denied certification. There was no allegation that the plaintiffs intended to try again in any future election. Since the 1968 election had been held, it was urged that no justiciable controversy remained. *See id.* at 89 S.Ct. 1493 (dissenting opinion of Mr. Justice Stewart). But the Court summarily dismissed this argument, saying only:

> [W]hile the 1968 election is over, the burden which MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 [a prior Supreme Court decision upholding the statute under attack] * * * allowed to be placed on the nomination of nominees for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935. The problem is therefore "capable of repetition, yet evading review," * * *. The need for its resolution thus reflects a continuing controversy in the federal-state area where our "one man-one vote" decisions have thrust. We turn then to the merits.

*Id.* 89 S.Ct. at 1494.

persuaded that every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy.

(1) The *Mitchell* case is itself a formidable barrier to any such conclusion. The employees who were not allowed to challenge the Hatch Act had plausibly complained of a veritable freezing effect on some of their political activities, which lie at the very core of the First Amendment's intended protection.[30] *Mitchell* does, of course, antedate the discovery and development of the chilling effect doctrine, and it has almost certainly been undermined to some extent by changing philosophies of the judicial function.[31] It is fair to say that in First Amendment cases *Mitchell* cannot now be read as an absolute bar to adjudication based on "general threats of enforcement." [32] But it is difficult to say in the teeth of *Mitchell* that *any* First Amendment chilling effect will do.

(2) Appellant's proposition that every official chill is a justiciable controversy would do considerable violence to the long-accepted allocation of roles among the several branches of the federal government. In view of the range of statutes, regulations, and policies which arguably chill protected expression, it would convert the courts into de facto Councils of Revision over a substantial body of legislative and executive rules, ensuring immediate judicial review without regard to the actual application of the rules in practice. A Council of Revision might or might not be inherently a bad idea, and in the First Amendment

area there are at least some things to be said in its favor, but it is well-settled that in general the federal courts are not such councils.[33] This principle is so venerable as to suggest caution in carving out an apparent major exception.

(3) Moreover, First Amendment chills may be disembodied from any identifiable legal context. The Hershey directive has enough of the trappings of formality, specificity, normative content, and apparent authoritativeness to remove the need for searching inquiries as to its precise legal standing. But the facts that it is contained only in a letter and made public only through a press release, and that it is not promulgated through any established rule-making procedure, illustrate the potential consequences of allowing complaints against every official breath of cold air. A speech or an announcement by General Hershey, or a personal plea from him urging local boards to reclassify war protesters, could cast nearly as heavy a pall over dissent as the issuance of the directive itself; but a court would pause long and searchingly before taking such chilling remarks as a sufficient predicate for a declaratory judgment that he had misstated the law or that the law he had correctly stated is unconstitutional.[34]

(4) One result of adjudicating wherever there is a chill may well be to require resolution of complex questions without the beneficial focus afforded by adversary argument trained upon a concrete factual dispute. To permit adjudication of a legal question or dispute solely on account of its chill is in effect

---

30. *See also* Alabama State Federation of Labor v. McAdory, *supra* note 20.

31. *See, e. g.,* Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) ; Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116 (1965).

32. *See, e. g.,* Reed Enterprises v. Corcoran, *supra* note 19.

33. *See* Flast v. Cohen, 392 U.S. 83, 130, and n. 19, 88 S.Ct. 1942 (1968) (dissenting opinion of Harlan, J.) ; *id.* at 107, 89 S.Ct. 1942 (opinion of Douglas, J.). *See also id.* at 95, 96, 89 S.Ct. 1942.

34. *See, e. g.,* Ashwander v. Tennessee Valley Authority, *supra* note 26, where the Court admonished :
 The pronouncements, policies and program of the Tennessee Valley Authority and its directors, their motives and desires, did not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of the persons complaining.
297 U.S. at 324, 56 S.Ct. at 472.

to concede that the substantive issues apart from the chill are themselves not ripe for adjudication. It follows that early vindication of First Amendment rights, however desirable in principle, is not without its costs in terms of the wisdom of the adjudications made incident thereto.[35] Unquestionably, some such costs are the inescapable price of effectively protecting the right to dissent. But we think the justiciability of public policies which chill protected expression must still depend to some extent upon a cost-benefit analysis addressed to the particular controversy before the court.

 In sum, we must reconcile the newly recognized urgency of prompt protection for frail First Amendment interests with the traditional policies underlying the case or controversy requirement. We must do so in uncharted waters, certain only that where there is only a "general threat of enforcement," not every chilling effect on protected expression resulting from the threat creates a justiciable controversy. Cognizant of the Supreme Court's expressed reluctance to adopt any "precise test" for a case or controversy,[36] we conclude that we should decide the justiciability of suits predicated on alleged chilling effects on a case-by-case basis. In determining whether a given chilling effect is sufficient, it would seem relevant to consider *inter alia:* (1) the severity and scope of the alleged chilling effect on First Amendment freedoms, (2) the likelihood of other opportunities to vindicate such First Amendment rights as may be infringed with reasonable promptness, and (3) the nature of the issues which a full adjudication on the merits must resolve, and the need for factual referents in order properly to define and

narrow the issues. These considerations become relevant, of course, only if the plaintiffs plausibly allege that they are in fact vulnerable to the alleged chilling effect. Assuming that the present appellants meet this threshold requirement, we turn now to examine their challenge to the Hershey directive and the delinquency regulations.

B. *The Hershey Directive.*

In considering whether the complaint against the Hershey directive is justiciable, we need not determine the precise legal status of the directive. General Hershey is authorized by 32 C.F.R. § 1604.1 (1968) both

> (a) To prescribe such rules and regulations as he shall deem necessary for the administration of the Selective Service System. * * *

and

> (b) To issue such public notices, orders, and instructions as shall be necessary for carrying out the functions of the Selective Service System.

It matters little whether his directive is a "rule," an "order," a set of "instructions," or only a sui generis "directive." Whatever it is in law, it purports to be an authoritative declaration of policy issued for the guidance of the System's line officers. Neither they nor the average would-be war protester whose destinies they control are likely to suspect that, for all its official pretensions, it is really only a reflective letter from an interested citizen, and that its exhortation to "expedite responsive classification," is nothing but the personal prayer of a venerable patriarch.

The substance of the directive is divisible into three parts: one part defining the authority of local draft boards under the delinquency regulations, another part

---

35. [A]dvance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multi-faced situation embracing conflicting and demanding interests, we have consistently refused to give.
United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 554, 5 L.Ed.2d 476 (1961). *See also* Flast v. Cohen, *supra* note 33, at 95, 96–97, 88 S.Ct. 1942.

36. *See* text, *supra* p. 1110.

(Local Board Memorandum No. 85) specifically applying the delinquency procedure to registrants who mutilate or abandon their draft cards, and a third part asserting the draft boards' authority independently of the delinquency regulations to deny defendants to otherwise eligible registrants who engage in various illegal anti-war activities. Since the considerations governing the justiciability of these three parts are not identical, we discuss each in turn.

### 1. *The delinquency regulations*

With respect to the delinquency regulations in general, the directive states that "if evidence of violation of the act and regulations is established," a local board may "declare the registrant a delinquent and * * * process him accordingly." This statement amplifies the provision of the delinquency regulations authorizing draft boards to declare delinquent a registrant who "has failed to perform any duty * * * required of him under the selective service law. * * *" 32 C.F.R. § 1642.4 (a) (1968).[37] Appellants attack the delinquency regulations both as written and as authoritatively construed by the directive. Either way, however, their attack prima facie alleges

> no threat of interference * * * with [their] rights * * * beyond that implied by the existence of the law and regulations.

United Public Workers v. Mitchell, supra, 330 U.S. at 91, 67 S.Ct. at 565.

 We think the alleged chilling effect of these regulations is insufficient to render them justiciable without a more specific threat of enforcement. The delinquency regulations do not themselves regulate expression. What chilling effect they may have derives from the provisions of the selective service law they are applied to enforce, and at least some of these provisions apparently do not in any way inhibit protected expression.[38] If, upon scanning the draft law, we should find a provision that does raise First Amendment problems, the chill attributable to the threat of its enforcement through the delinquency regulations would be barely noticeable beside the frigid blast from the severe criminal penalties attached to the offending provisions.[39] The mere possibility that more prosecutors than draft boards will abstain from enforcement is thin ice on which to rest the kind of chill that hardens general threats into justiciable controversies.

We think appellants' complaint against the delinquency regulations lies rather— if at all—against particular provisions of the draft law which threaten First Amendment injury. The added chill of anticipated enforcement through the delinquency regulations would be a factor to be considered in determining the justiciability of a challenge to such a provision. The delinquency portion of the present complaint, however, neither demonstrates a grave chill nor focuses on a narrowly-defined legal question. Accord-

---

37. On its face, the directive thus appears to broaden the regulation. The regulation in terms conditions delinquency proceedings on *failure to perform* a required duty —*i. e.*, on breaches of affirmative obligations imposed by the Act. Apparently because of this limitation, the Second Circuit has held unauthorized any use of the delinquency regulations against a registrant who violates only the statutory provision forbidding any person to "knowingly hinder or interfere or attempt to do so in any way * * * with" Selective Service administration. Wolff v. Selective Service Local Board No. 16, *supra* note 11, 372 F.2d at 821–822. The Hershey directive, however, ignores this apparent

limitation and approves delinquency declarations for any violation of the Act or regulations, whether by nonfeasance or by malfeasance.

38. *E. g.*, the registration provision of 50 U.S.C.App. § 453 (1964), or the falsification provisions of 50 U.S.C.App. § 462 (Supp. III, 1965–67).

39. Violations of the Act or regulations are punishable by a fine of up to $10,000 and/or a jail sentence of up to five years. 50 U.S.C.App. § 462(b) (Supp. III, 1965–67). If the criminal provisions had, in common knowledge, fallen into desuetude, the chill of the delinquency regulations might be greater.

ingly, it does not present a justiciable case or controversy.

### 2. *Local Board Memorandum No. 85*

In Local Board Memorandum No. 85, the Hershey directive specifically endorses invocation of the delinquency regulations against registrants who abandon or mutilate their draft cards, and the affidavits attached to appellants' complaint indicate that the regulations are in fact being so applied. Mutilation is prohibited by Section 462(b) of the Act, and abandonment results in a violation of 32 C.F.R. § 1617.1 (1968), which requires a registrant to have his draft card in his personal possession at all times. Appellants' complaint against the Local Board Memorandum may reasonably be construed as a First Amendment challenge to these two provisions and specifically to their enforcement by means of the delinquency regulations.

The substantive provisions barring mutilation and requiring possession might on their face be thought to pose substantial First Amendment questions, for burning up and turning in draft cards are now time-honored gestures of dissent from official policy. However, in United States v. O'Brien,[40] the Supreme Court upheld a severe sentence for incendiary mutilation. It follows that the threat to enforce the mutilation provision by a declaration of delinquency does not infringe First Amendment rights: the threatened conduct is clearly defined,[41] and severe punishment of conduct so defined is constitutional; ergo, General Hershey's intent to punish it in his own way, even if illegal for other reasons, works no First Amendment injury. While *O'Brien* was not specifically concerned with the possession regulation, the Court's rationale plainly protects the First Amendment flanks of that regulation as well.[42] Since Local Board Memorandum No. 85 thus does not chill *protected* conduct, the asserted predicate for justiciability disappears.

### 3. *The deferment policy*

The remaining portion of the Hershey directive apparently announces a policy of denying relief from the obligation of military service to those who engaged in illegal conduct which does not violate the Selective Service Act or regulations. The relevant text states that

> the military obligation for liable age groups is universal and * * * deferments are given only when they serve the national interest * * *. It follows that * * * illegal activity which interferes with recruiting or causes refusal of duty in the military or naval forces could not by any stretch of the imagination be construed as being in support of the national interest.

It goes on to say that

> demonstrations, when they become illegal, have produced and will continue to produce much evidence that relates to the basis for classification. * * *

> A local board, upon receipt of [such evidence] * * * may reopen the classification of the registrant and classify him anew * * *,

and concludes with an injunction to "expedite responsive classification * * *

---

40. 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

41. As noted in subpart 3, *infra*, enforcement of vague criminal statutes by draft boards might raise First Amendment problems even if the statute itself could withstand a First Amendment attack against it on its face.

42. The Court repeatedly characterized the governmental interest it found sufficient to overcome the detrimental effects of the mutilation provision on free expression as the "smooth and proper functioning" of the Selective Service System promoted by

"the continuing availability to each registrant of his Selective Service certificates * * *." 391 U.S. at 380, 381, 382, 88 S.Ct. at 1681 (emphasis added). Of the four ways it found in which mutilation might impede this smooth functioning, *id.* at 378–380, 88 S.Ct. at 1680, only one—the facilitation of falsification—does not apply with equal force to support the possession requirement. Nor can we say that the governmental interest the Court found ample to support the mutilation provision could be served as well by a less sweeping requirement than that of the possession regulation.

**1118**

to the greatest possible extent consistent with sound procedure." [43]

For all that appears, this declaration of war against anti-war protesters springs full-grown from the head of General Hershey, without benefit of reference to any provision of the Act or regulations. In this sense, it may be something more than a general threat to enforce the law. In addition, each of the considerations which bear on the appropriateness of an exception to the *Mitchell* rule point toward the "immediacy and reality," and also the specificity of the First Amendment interests at stake. Golden v. Zwickler, *supra*.

■ (a) The deferment policy is expressly directed only at "illegal" demonstrations and interference, although at least one local board has apparently failed to notice that limitation.[44] A complaint that illegal and unprotected conduct is being chilled has, of course, no special claim to prompt adjudication.[45] But the Hershey directive neither said nor meant that war protesters were to be reclassified only after a conviction for violation of a statute which the courts have found to be consistent with the First Amendment. Thus, it may deter not merely validly proscribed conduct, but any protest activity which a registrant could plausibly expect his draft board to think unprotected or illegal.

It is no reflection on the competence or integrity of selective service personnel to observe that they are ill-equipped to determine questions of law as delicate

and complex as those commonly raised by anti-war protest activity. Draft boards do not employ judicial procedures, and their members often have no legal training. Rightly or not, registrants are also likely to have less confidence in the constitutional sensitivity of their draft board, especially in the area of war dissent, than in that of the prosecutor and the courts. These considerations loom particularly large in the light of the frequent vagueness and overbreadth of the myriad local laws and ordinances which are susceptible of application against protest activities and which cannot conceivably all be subjected to judicial review in the foreseeable future. As the cases arising out of civil rights demonstrations have shown, some of these hitherto untested laws may well be unconstitutional on their face. Many others undoubtedly require a judicious exercise of prosecutorial discretion or a narrowing construction before they can survive First Amendment scrutiny. The resultant uncertainty concerning the legality of various forms of dissent imposes some chill on protected protest even without the Hershey directive. But by entrusting to draft boards effective power to decide the hard legal and constitutional questions for themselves, the directive seriously compounds this chilling effect on protected conduct.

The directive's deferment policy also adds to the deterrents to legal protest by raising the price of a wrong guess as to the legality of particular protest activity or of a failure to foresee the course an

43. The directive draws a consistent and unmistakable distinction between violations of the Act or regulations, which may be grounds for a delinquency declaration, and other illegal activities, which warrant only reclassification (without, presumably, the additional consequence attached to a I-A classification made under the delinquency regulations—namely, that the registrant is to be inducted before other I-A registrants: see 32 C.F.R. §§ 1642.12, 1642.13, 1631.7 (1968)). See text, *supra*, p. 1105.

44. Appellants submitted with their brief a letter from an Oklahoma local board

informing a registrant that he was being deprived of his II-S student deferment because "the local board did not feel that your activity as a member of SDS is to the best interest of the U. S. Government." The registrant's appeal board did, however, restore his deferment.

45. We have held, *infra*, that the directive's chilling effect on burning or turning in draft cards does not create a justiciable controversy largely because the Supreme Court has established that such protest activities are not protected conduct.

initially legal demonstration may take. Participation in most lawful demonstrations unavoidably involves at least some risk that the protest will in fact get out of hand or that the authorities will decide that it has done so; innocent participants may then be penalized along with the rest. The directive adds a new and—at least in the eyes of many protesters—a more severe penalty for such unintentional illegality. Draft eligible males who are willing to run the risk of prosecution for a misdemeanor in order to make a protest might still be intimidated by the threat of a I–A classification.

Accordingly, we think the deferment policy works a pronounced chilling effect on legal or protected conduct.

(b) If draft boards in fact effectuate the Hershey directive, it may be exceedingly difficult to challenge the legality of their action. The breadth of the draft board's unreviewable discretion is legendary. While the law may be narrower than the legend, both Congress and the courts have forbidden judicial review of the sufficiency of the evidence to support a classification decision. Thus, Section 10(b) (3) provides that even in a prosecution for refusal of induction, the court's inquiry shall extend to the draft board's jurisdiction "only when there is no basis in fact for the classification assigned." *See also* Estep v. United States, *supra*. This provision raises the possibility that a classification assigned for an illicit reason is unreviewable whenever the draft board can point to some other possible supporting ground under the general language of the classification provisions. Furthermore, even if the statute is not a bar to review of such classifications, a registrant may have serious difficulty in discovering or proving the actual basis of his draft board's action. Thus, if a complaint such as that of appellants does not lie, the chill of the Hershey directive's deferment policy may spread indefinitely without any judicial determination of its legality.

(c) Unlike the directive's threat of delinquency proceedings, which applies even-handedly to all violations of the Selective Service law, the deferment policy expressly singles out from the infinite range of illegal conduct specific kinds of illegal acts—namely those commonly performed by war protesters—for special treatment. The result is both to impart an element of specificity to the threat of enforcement and to accentuate its potential chilling effect on protected expression.

(d) Finally, the issues raised by this aspect of appellant's complaint are narrow and clearly defined. Appellants question the authority for and the constitutionality on its face of a simple and specific policy. Neither of these issues turns on the way in which the policy is applied. Thus, a delay in adjudication holds no promise of "a better case."

For these reasons, we hold that, given a complaining party whose First Amendment rights are chilled, a suit against that portion of the Hershey directive which purports to authorize denial of deferments for illegal activity not covered by the delinquency regulations presents a justiciable controversy.

### C. *Standing.*

To establish that there is a case or controversy *as to them*, appellants must be vulnerable to the chilling effect of the justiciable portion of the Hershey directive.[46] The individual appellants sue

---

46. Constitutional standing is an aspect of the case or controversy requirement. Flast v. Cohen, *supra* note 26, 392 U.S. at 98–99, 88 S.Ct. 1942. The standing question, insofar as it rises to constitutional dimensions, is whether the plaintiff has at stake a sufficient interest so as to create a case or controversy *as to him.* Thus, a chilling effect which amounts to a justiciable injury confers standing to challenge the source of the chill on any person who plausibly alleges that he is chilled. We think non-constitutional standing doctrines must yield to the policy of prompt vindication of First Amendment rights. *Cf.* Dombrowski v. Pfister, *supra* note 31, 380 U.S. at 486–487, 85 S.Ct. 1116.

for themselves and for fellow students "similarly situated." The appellant organizations also assert both their own interests and those of their members. And one of these organizations (the National Student Association) purports to speak for "all students in institutions of higher learning in America." Nonetheless, appellee earnestly contends that not a single member of this vast legion of plaintiffs has standing to sue because none has alleged that he or those he represents are liable to be drafted.[47]

It is true that a particular male student might be physically unfit or might already have fulfilled his military obligation. But it is hardly open to dispute that most male college students are draft-eligible. Since the appellant organizations are all associations of college students, their memberships include vast numbers of men who are both subject to the draft and presently deferred from immediate service. Nor is it any secret that the bulk of the nation's war protesters come from the ranks of college students. College students are in fact the segment of the population most obviously vulnerable to General Hershey's threat of reclassification.

■ The appellant organizations are all student political associations. As organizations, they have been critical of the draft, or the war in Vietnam, or both; and they have been substantially involved in protest activity. With respect to the Hershey directive, their organizational interests and those of at least many of their members coincide. Any chilling effect on the protected protests of their members is at the same time a damper on their organizational protest activities.[48] We think they have standing to assert both their own First

47. An affidavit attached to appellants' brief does indicate incidentally that one appellant, Reverend Bruce Tischler, is eligible for the draft and has, in the past, engaged in active protest against the war in Vietnam. However, Tischler's induction was stayed pending the Supreme Court's decision in Oestereich v. Selective Service System Local Board No. 11, *supra* note 18. Though *Oestereich* dealt specifically with the delinquency regulations, its holding that a ministerial exemption such as Tischler previously enjoyed may not be removed by draft boards for reasons unrelated to the registrant's ministerial status applies *a fortiori* to reclassification under the Hershey directive. Thus, *Oestereich* effectively removes the threat to Tischler of reclassification for future protest activity and casts considerable doubt on his standing to challenge the Hershey directive. Standing is apparently to be determined as of the date of decision, not as of the date on which the suit was instituted. *See* Golden v. Zwickler, *supra* note 29.

48. The National Student Association (NSA) and Students for a Democratic Society (SDS) both contend that, because their anti-draft and anti-war protest activities are well known, their members may fear reclassification under the Hershey directive simply on account of their membership. As a result, they say, the directive may cause them to lose present or prospective members. That this fear is not wholly illusory is demonstrated by a letter, attached as an exhibit to appellant's brief, in which an Oklahoma draft board announced its reclassification (to I-A) of a previously deferred student because the local board did not feel that your activity as a member of SDS is to the best interest of the U. S. Government. The appeal board reversed this reclassification. *See* note 44, *supra*. We would be reluctant to rely solely on the threat of reclassifications for mere membership in one of the appellant organizations to establish its vulnerability to the chilling effect of the Hershey directive, since a careful reading of the directive would not support such reclassifications. On the other hand, the directive does assert that "deferments are given only when they serve the national interest." Especially in view of the action of the Oklahoma local board, an SDS member's fear that his draft board would seize upon this assertion as grounds for denying him deferment cannot be said to be wholly unreasonable. And it is ultimately the appearance to members, not the actuality, of the threat which determines its chilling effect.

Amendment interests [49] and those of their members.[50]

We find it unnecessary to consider whether the individual appellants have standing to represent their fellow students—especially because, as we conclude hereafter, injunctive relief is inappropriate.

III. LEGALITY OF THE HERSHEY DIRECTIVE'S DEFERMENT POLICY.

Although appellants, who moved for summary judgment below, now seek reversal on the merits, appellee has chosen to rest on procedural contentions; and he does not suggest that any disputed issues of fact make summary judgment inappropriate. Nonetheless, we would be reluctant to decide the merits if the legal question were complex or uncertain. It is neither. And since its resolution does not turn on any issue of fact, no purpose would be served by remanding to permit initial consideration by the District Court.

Insofar as the individual classification decisions of the Selective Service System are unreviewable in theory or in practice, the Hershey directive's deferment policy establishes the System as the final arbiter of the legality of protest activities under the law and the validity of laws regulating protest under the Constitution. Such authority vested in draft boards could itself survive First Amendment challenge only if required by an imperious public interest that could be served by no means which would sweep less broadly over legitimate dissent.[51] Since prosecution of illegal and unprotected conduct under the criminal laws, subject to traditional procedural safeguards and to judicial scrutiny of the laws themselves, is a narrower alternative means to the ends served by the Hershey policy, that policy appears to be constitutionally unsound. In any event, the constitutional doubts are sufficiently grave that it could be authorized only by the most explicit statutory language. And far from containing such language, the Selective Service Act appears to exclude protest activity as a relevant basis for classification.

The exemption and deferment provisions of the Act vary in the breadth of discretion they accord the President and, through him, the Selective Service System. In some cases, they make no mention of any presidential discretion. For example, the statute provides unequivocally that ordained ministers "shall be exempt." 50 U.S.C.App. § 456(g) (1964). Similarly, it directs that nothing in it "shall be construed" to require military service by conscientious objectors. 50 U.S.C.App. § 456(j) (Supp. III, 1965–67). In other cases, the President is required to defer a specified class of registrants, but is expressly given discretion to implement this requirement by prescribing "rules and regulations." Thus, Section 456(h) (1) says that he

---

49. *See* NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). There, the Court held:

> We think petitioner may assert this right [to freedom of association] on its own behalf, because, though a corporation, it is directly engaged in those activities, claimed to be constitutionally protected, which the statute would curtail.

*Id.* at 428, 83 S.Ct. at 335.

50. *Id. See also* NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ; United Federation of Postal Clerks v. Watson, —— U.S.App.D.C. ——, 409 F.2d 462 (decided February 27, 1969) ; Citizens Ass'n of Georgetown v. Simonson, 131 U.S.App. D.C. 152, 403 F.2d 175 (1968), cert. denied

*sub nom.* 3259 M Street, Inc. v. Citizens Ass'n of Georgetown, 394 U.S. 975, 89 S.Ct. 1454, 22 L.Ed.2d 755 (1969) ; Smith v. Board of Education, 365 F.2d 770, 776–777 (8 Cir. 1966) ; MacArthur Liquors, Inc. v. Palisades Citizens Ass'n, 105 U.S. App.D.C. 180, 265 F.2d 372 (1959).

51. In United States v. O'Brien, *supra* note 40, the Court expressly articulated the long-apparent rule that restrictions on First Amendment freedoms incident to governmental regulation designed to promote a substantial non-First Amendment interest must be "no greater than is essential to the furtherance of that interest." 391 U.S. at 377, 88 S.Ct. at 1679. *See also,* Aptheker v. Secretary of State, 378 U.S. 500, 508–509, 84 S.Ct. 1659, 12 L.Ed. 2d 992 (1964) ; NAACP v. Alabama ex

shall, under such rules and regulations as he may prescribe, provide for the deferment * * * of persons satisfactorily pursuing a full-time course of instruction at a college [or] university,

and declares that such student deferments, once granted, "shall continue" until the student graduates, backslides academically, or grows too old, or until the President makes a finding that the needs of the Armed Forces require their terminaton. 50 U.S.C.App. § 456(h) (1) (Supp. III, 1965–67). Still other provisions define classes of registrants the President may, but need not, defer according to "such rules and regulations as he may prescribe," if he finds their designated activities to be "necessary to the maintenance of the national health, safety, or interest." 50 U.S.C.App. § 456 (h) (2) (Supp. III, 1965–67).

The justiciable portion of the Hershey directive purports to authorize reclassification, independently of the delinquency regulations, of any registrant who engages in illegal protest activity. We have denominated this portion the "deferment policy" in order to distinguish it from the policy of reclassification pursuant to

the delinquency regulations. There is, however, no reason to believe that the "deferment policy" intends any distinction between "deferments" and "exemptions." It asserts without qualification that, upon receipt of evidence relating to the basis of "classification" arising out of illegal demonstrations, a local board "may reopen the classification of the registrant and classify him anew. * * * *" [52] This policy is in blatant conflict with the statutory language prescribing mandatory relief from military obligation for ministers and conscientious objectors.[53]

The conflict is only somewhat less apparent where the President is specifically given discretion to prescribe "rules and regulations," or to deny deferments to an entire class.[54] The clear pattern of the Act is to define classes of persons whose deferment or "exemption" Congress has concluded either is in fact, or may be, in the national interest, and to allow the President more or less discretion to decide who falls within each designated class. It would do extreme violence to this pattern to hold that the President by regulation—much less the Selective Service Director by "direc-

rel. Flowers, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964); NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1964); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

52. When the directive does use the word "deferment," it appears to mean by it any relief from the obligation of military service. Thus, the directive explains that "the military obligation for liable age groups is universal and * * * deferments are given only when they serve the national interest." The directive also speaks of denying "deferments" under the delinquency regulations, but those regulations are not limited in terms to deferments, as opposed to exemptions, and they have not been so limited in practice—witness Oestereich v. Selective Service Local Board No. 11, supra note 18, and the case of Plaintiff Tischler in this action (see note 47, supra).

53. It is for the local board to determine whether a registrant qualifies as a conscientious objector. Clark v. Gabriel, supra note 14. But Congress has defined

in some detail the necessary qualifications, 50 U.S.C.App. § 456(j) (Supp. III, 1965–67), and they have nothing whatever to do with whether, in addition to being "conscientiously opposed to participation in war in any form," a registrant conscientiously avoids all illegal protest activity. The Section says simply that those who are conscientiously opposed as defined shall not be required to do military service.

54. The conflict may be enough less apparent to be insufficient in itself to justify pre-induction review of a classification in the face of Section 10(b) (3) of the Act (see text supra, Part I). Boyd v. Clark, 393 U.S. 316, 89 S.Ct. 553, 21 L.Ed.2d 511 rehearing denied, 393 U.S. 1112, 89 S.Ct. 852, 21 L.Ed.2d 812 (1969); Kolden v. Selective Service Local Board No. 4, 406 F.2d 631 (8 Cir. 1969); Breen v. Selective Service Local Board No. 16, 406 F.2d 636 (2 Cir.), cert. granted, 394 U.S. 997, 89 S.Ct. 1592, 22 L.Ed.2d 774 (1969). But that conclusion, if it is correct, does not of course establish that there is no conflict.

tive"—may exclude from the statutory class persons who plainly fall within the contours Congress has defined. Such a holding would license the Selective Service System to defeat rather than to implement the apparent Congressional purpose.

Nor does the fact that local boards are given "final" authority to determine a registrant's eligibility for a class which Congress has directed the President to defer mean that such boards may use any criteria of membership that they or their Director may think proper. So construed, the statute would make the boards "freewheeling agencies meting out their [own] brand of justice * *," and would raise "serious questions" as to whether Congress could delegate such power without setting any limiting standards. Oestereich v. Selective Service System, *supra*, 393 U.S. at 237, 89 S.Ct. 414. We think the test of eligibility for any deferment or exemption to be applied by the local boards is the definition of the deferrable class prescribed by Congress, as supplemented by regulations reasonably and consistently lending precision to that definition.

General Hershey's asserted authority rests on the following syllogism: "deferments are given only when they serve the national interest"; "illegal activity which interferes with recruiting or causes refusal of duty * * *" is not in the national interest; therefore "it follows that" such activity may deprive a registrant of his deferment. Even if both

premises were conceded, the conclusion does not "follow." That some of a man's activities are contrary to the national interest has no necessary bearing on the value to the nation of the activities or pursuits for which he was deferred. The research activities of a doctor or atomic scientist are no less in the national interest because he also cheats on his income tax, distributes pornography, beats his wife, or marches for peace. Until Congress says that deferments are conditioned on good behavior we must assume that it meant to defer those who engage in the activities it declared to be in the national interest, and not only those whose general deportment is above a draft board's reproach.[55]

Accordingly, we hold that the deferment policy announced in the Hershey directive is unauthorized and contrary to the law. *Cf.* Wolff v. Selective Service Local Board No. 16, *supra*. Aside from violations covered by the delinquency regulations—the legality of which is not properly before us—a registrant's protest activities are not to be considered in determining his selective service classification.

For many reasons we do not, however, grant the requested injunction to accompany this declaratory judgment. The practical problems of enforcing an injunction against every local and appellate draft board are staggering. In view of the wide and largely "final" discretion enjoyed by these boards, it will often be

55. In Breen v. Selective Service Local Board No. 16, *supra* note 54, the court appeared to conclude that the statute does not prevent a draft board from reclassifying a previously deferred undergraduate student *as a delinquent* for turning in his draft card. Accord, Anderson v. Hershey, 410 F.2d 492 (6 Cir. 1969); *but see* the contrary implication of Kolden v. Selective Service Board No. 4, *supra* note 54. The *Breen* and *Anderson* courts cited the concluding sentence of the undergraduate deferment provision, 50 U.S.C.App. § 456(h) (1) (Supp. III, 1965–67), which describes the so-called prime age group as those who are to be inducted first "after delinquents." Even if this reference to delinquents is to be construed as a retroactive

congressional authorization of the delinquency regulations, it does not supply any authority for reclassification according to non-statutory criteria outside the delinquency regulations.

In United States v. Gutknecht, 406 F.2d 494 (8 Cir.), cert. granted, 394 U.S. 997, 89 S.Ct. 1595, 22 L.Ed.2d 774 (1969), the court held that the delinquency regulations could be applied to accelerate the induction of a I-A registrant, but emphasized that it was

not confronted here with a *reclassification* which * * * attempts to deprive the defendant of any existing statutory exemption *or deferment.*

406 F.2d at 496 (emphasis added).

impossible to detect any use of illicit criteria. Indeed, we do not even know that the offending portion of the directive is in fact being widely applied. Moreover, respect for the integrity of a coordinate branch of government argues for judicial restraint. Finally, we have no reason to believe that draft board members would act contrary to the law as judicially declared.[56]

We remand to the District Court for entry of a declaratory judgment not inconsistent with this opinion.

Reversed.

56. None of the parties to this litigation has requested that a three-judge court be convened under 28 U.S.C. § 2282 (1964). That Section does not apply to suits seeking injunctions against "administrative orders," as distinguished from "Acts of Congress." William Jameson & Co. v. Morgenthau, 307 U.S. 171, 173–174, 59 S.Ct. 804, 83 L.Ed. 1189 (1939). The Supreme Court has been less than lucid in indicating how this distinction is to be made in practice. See D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 51–55 (1964). However, it has been held that "the cumbersome three-judge procedure" is not required where

> an Act of Congress confers authority on an administrator in general terms which could be read either to embrace or to exclude the challenged action, and appli-

cation of the statute is clearly constitutional in certain cases but arguably not so in the administrative scheme under attack.

Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 115 (2 Cir. 1966). In such cases, the injunction sought would not threaten "to paralyze totally the operation of an entire regulatory scheme," Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963), but only to restrain an administrator who has "acted with too heavy a hand." Sardino v. Federal Reserve Bank of New York, supra at 115–116. The Sardino holding applies a fortiori to the instant case, where the challenged directive does not even recite any statutory authority and where the sought injunction would accordingly leave the statute wholly intact.