Alice ROBERTS et al.,
Plaintiffs–Appellants,

v.

Edward T. AUSTIN, individually and in his official capacity as State Attorney, Fourth Judicial Circuit, State of Florida et al., Defendants–Appellees.

No. 80–5384.

United States Court of Appeals,
Fifth Circuit.
Unit B

Dec. 15, 1980.

Rehearing and Rehearing En Banc
Denied Jan. 13, 1981.

Mark Greenberg, Jacksonville Area Legal Aid, Inc., Jacksonville, Fla., for plaintiffs–appellants.

Stephen R. White, Asst. State's Atty., Jacksonville, Fla., for Austin, Atwater & Saitta.

Leo Stellwager, Dist. Counsel, Dept. of Health & Rehab. Services, Robert M. Eisenberg, Jacksonville, Fla., for HRS, David Pingree, et al.

Before HILL, KRAVITCH and HATCHETT, Circuit Judges.

HATCHETT, Circuit Judge:

In this case we must interpret the Food Stamp Act, 7 U.S.C. §§ 2011–2027, and the regulations promulgated thereunder, to determine congressional intent concerning both the investigation of food stamp fraud and the confidentiality to be accorded the case files of food stamp recipients.

Appellants, food stamp recipients, appeal a district court order denying a preliminary

injunction that would enjoin both the state agency administering the Food Stamp Program in Florida, the Department of Health and Rehabilitative Services (hereinafter HRS), and the State Attorney for Florida's Fourth Judicial Circuit from certain practices claimed to violate appellants' statutory and constitutional rights. The practices sought to be enjoined arise out of an ongoing investigation of food stamp fraud by the state attorney. The state attorney subpoenaed and secured from HRS the files of all food stamp recipients who received at least $125 per month in food stamps. The state attorney had no reason to believe that any particular recipient engaged in food stamp fraud. In denying the injunction, the trial court found the state attorney, pursuant to 7 C.F.R. § 272.1(c),[1] "directly connected with enforcement of the Food Stamp Program," so that HRS may release any requested files absent such reason to suspect fraud. Further, the trial court found "no protected right of privacy in the information furnished." Our interpretation of the regulations is that they mandate a showing of suspicion of fraud prior to release by HRS of recipient files. The Food Stamp Act also manifests a strong congressional intent to maintain the confidentiality of recipient files. In accordance with this interpretation, we find that the proposed preliminary injunction satisfied the established requirements for granting an injunction. We therefore hold that the trial court abused its discretion, and we reverse the denial.

## FACTS

Appellants, (hereinafter recipients) and members of the class they seek to represent, are low–income individuals who reside in the three–county area of the Fourth Judicial Circuit, and who participate in the Food Stamp Program in Florida. In early 1979, there were 3,117 individuals participating in the Food Stamp Program in Nassau County, 2,604 in Clay County, and 59,647 in Duval County. Recipient households participating in the Food Stamp Program receive monthly coupon allotments which may be used to purchase certain grocery items. Congress created the Food Stamp Program to alleviate hunger and malnutrition among the nation's low–income households. 7 U.S.C. § 2011.[2] The Food Stamp Program is a cooperative endeavor between federal and state governments. The federal

1. 7 C.F.R. 272.1(c) provides:

 (c) Disclosure. (1) Use or disclosure of information obtained from food stamp applicant households, exclusively for the Food Stamp Program, *shall be restricted to persons directly connected with the administration or enforcement of the provisions of the Food Stamp Act or regulations*, or the Food Distribution Programs as defined in Part 283 of this Subchapter, or with other Federal or federally aided, means ·tested assistance programs such as Title IV A (AFDC), XIX (Medicaid), or XVI (SSI), or with general assistance programs that are subject to the joint processing requirements specified in § 273.-2(j)(2). [Emphasis added.]

 (2) If there is a written request by a responsible member of the household, its currently authorized representative, or a person acting on its behalf to review material and information contained in its casefile, the material and information contained in the casefile shall be made available for inspection during normal business hours. However, the State agency may withhold confidential information, such as the names of individuals who have disclosed information about the household with the household's knowledge, or the nature or status of pending criminal prosecutions. [Emphasis added.]

2. 7 U.S.C. § 2011 provides:

 It is hereby declared to be the policy of Congress, in order to promote the general welfare, to safeguard the health and well-·being of the Nation's population by raising levels of nutrition among low income households. Congress hereby finds that the limited food purchasing power of low income households contributes to hunger and malnutrition among members of such households. Congress further finds that increased utilization of food in establishing and maintaining adequate national levels of nutrition will promote the distribution in a beneficial manner of the Nation's agricultural abundance and will strengthen the Nation's agricultural economy, as well as result in more orderly marketing and distribution of foods. To alleviate such hunger and malnutrition, a food stamp program is herein authorized which will permit low·income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation.

government provides the entire value of the food stamp coupons to state agencies, along with fifty percent or more of all administrative funds for program operation. The state agencies (HRS in Florida) agree to administer the program in accordance with the Food Stamp Act, and the regulations promulgated thereunder. 7 U.S.C. § 2020.[3]

3. 7 U.S.C. § 2020 provides, in pertinent part:

(a) The State agency of each participating State shall assume responsibility for the certification of applicant households and for the issuance of coupons and the control and accountability thereof. There shall be kept such records as may be necessary to ascertain whether the program is being conducted in compliance with the provisions of this Act and the regulations issued pursuant to this Act. Such records shall be available for inspection and audit at any reasonable time and shall be preserved for such period of time, not less than three years, as may be specified in the regulations issued pursuant to this Act.

. . . . .

(d) The State agency (as defined in section 3(n)(1) of this Act [7 USC § 2012(n)(1)]) of each State desiring to participate in the food stamp program shall submit for approval a plan of operation specifying the manner in which such program will be conducted within the State in every political subdivision. . . .
(e) The State plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation–

. . . . .

(3) that the State agency shall thereafter promptly determine the eligibility of each applicant household by way of verification only of income other than that determined to be excluded by section 5(d) of this Act [7 USC § 2014(d)] and such other eligibility factors as the Secretary determines to be necessary to implement sections 5 and 6 of this Act [7 USC §§ 2014, 2015], so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application;

. . . . .

(5) the specific standards to be used in determining the eligibility of applicant households which shall be in accordance with sections 5 and 6 of this Act [7 USC §§ 2014, 2015] and shall include no additional requirements imposed by the State agency;
(6) that (A) the State agency shall undertake the certification of applicant households in accordance with the general procedures prescribed by the Secretary in the regulations issued pursuant to this Act;

. . . . .

(8) safeguards which limit the use or disclosure of information obtained from applicant households to persons directly connected with the administration or enforcement of the provisions of this Act or the regulations issued pursuant to this Act.

. . . . .

(f) To encourage the purchase of nutritious foods, the Secretary shall extend the expanded food and nutrition education program to the greatest extent possible to reach food stamp program participants. The program shall be further supplemented by the development of single concept printed materials, specifically designed for persons with low reading and comprehension levels, on how to buy and prepare more nutritious and economical meals and on the relationship between food and good health.
(g) If the Secretary determines that in the administration of the food stamp program there is a failure by a State agency to comply with any of the provisions of this Act, the regulations issued pursuant to this Act, or the State plan of operation submitted pursuant to subsection (d) of this section, the Secretary shall immediately inform such State agency of such failure and shall allow the State agency a specified period of time for the correction of such failure. If the State agency does not correct such failure within that specified period, the Secretary may refer the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by the State agency and, upon suit by the Attorney General in an appropriate district court of the United States having jurisdiction of the geographic area in which the State agency is located and a showing that noncompliance has occurred, appropriate injunctive relief shall issue.
(h) If the Secretary determines that there has been negligence or fraud on the part of the State agency in the certification of applicant households, the State shall, upon request of the Secretary, deposit into the Treasury of the United States, a sum equal to the face value of any coupon or coupons issued as a result of such negligence or fraud.
(i) Notwithstanding any other provision of law, the Secretary and the Secretary of Health, Education, and Welfare shall develop a system by which (1) a single interview shall be conducted to determine eligibility for the food stamp program and the aid to families with dependent children program under part A of title IV of the Social Security Act [42 USC §§ 601 et seq.]; (2) households in which all members are recipients of supplemental security income shall be permitted to apply for participation in the food stamp program by executing a simplified affidavit at the social security office and be certified for eligibility utilizing information contained in files

Income, expenses, and assets of applicant households determine eligibility for food stamps. Household income and expenses fix monthly household coupon allotments. HRS, through local food stamp offices, receives and acts upon applications from households seeking food stamps. For each applicant household HRS maintains an individual case file containing information provided to the food stamp office by the household and a case record of participation in the program.

Appellee, Austin, is the State Attorney for the Fourth Judicial Circuit. The Office of State Attorney is a constitutional office created by Article 5, § 17 of the Florida Constitution. The state attorney, as the prosecuting attorney in each judicial circuit, is responsible for the prosecution of public assistance fraud, which is a state criminal offense pursuant to Fla.Stat.Ann. § 409.325.

In February of 1979, the State Attorney for the Fourth Judicial Circuit initiated an investigation of food stamp recipients in Nassau County, Florida. Assistant state attorneys went to the Nassau County Food Stamp Office and requested the food stamp case files of all persons in the county who were receiving a monthly food stamp coupon allotment of $125 per month or more. The state attorney made this request without any lawful process, subpoena or warrant. The case files requested for investigation were chosen solely because the affected households received food stamp allotments of $125 a month or more. No official of HRS, and no representative of the state attorney, had any reason to suspect that

particular members of the affected households had engaged in public assistance fraud.

The supervisor of the Nassau County Food Stamp Office gave all requested files to the state attorney. Subsequently, HRS requested to be served with a subpoena for the files already reviewed by the state attorney and for any future files. The state attorney complied, and served a subpoena mandating the production of "any and all applications, records, worksheets, or any other pertinent information pertaining to any Nassau County food stamp recipient." After HRS released the case files, the state attorney reviewed the files and filled out information sheets for all affected households, recording each household's source and amount of income, resources, household composition, medical expenses, rent or mortgage amounts, utility costs, child support or alimony.

These information sheets were distributed to local police personnel. The state attorney advised the police to conduct a criminal investigation and verify, through standard criminal investigative techniques, the information collected on these forms. The state attorney asked the police to contact neighbors, employers, and others who might be familiar with the household's circumstances to verify the information previously provided to the Food Stamp Program. The state attorney also instructed the police not to disclose unnecessarily any of the information obtained.

Over the next six months, an estimated 500 households in Nassau County were *sub-*

---

of the Social Security Administration; (3) households in which all members are included in a federally aided public assistance or State or local general assistance grant shall have their application for participation in the food stamp program contained in the public assistance or general assistance application form; and (4) new applicants, as well as households which have recently lost or been denied eligibility for public assistance or general assistance, shall be certified for participation in the food stamp program based on information in the public assistance or general assistance case file to the extent that reasonably verified information is available in such case file.

(j) The Secretary, in conjunction with the Secretary of Health, Education, and Welfare, is authorized to prescribe regulations permitting applicants for and recipients of social security benefits to apply for food stamps at social security offices and be certified for food stamps eligibility in such offices in order that the application and certification for food stamp assistance may be accomplished as efficiently and conveniently as possible.

(k) Subject to the approval of the President, post offices in all or part of the State may issue, upon request by the State agency, food stamps to eligible households.

*jected to criminal investigations.* The local police compared the information obtained in the community with that which applicants previously gave to the food stamp office. The sole basis for investigative targets was the amount of food stamps received.

During the summer of 1979, the state attorney initiated a substantially similar investigation in Clay County. Without requiring any showing or reason to suspect fraud, HRS again turned over hundreds of case files. In turn, the state attorney disseminated this information to local police for verification through criminal investigation.

It remains the position of HRS that so long as the state attorney provides a subpoena, HRS officials will release any and all requested case files without regard to whether there is any basis to suspect affected households of fraud.

In district court, recipients asserted that HRS's release of all requested food stamp case files to the state attorney without any reason to suspect individuals of fraud violated the statutory rights of recipients. Recipients base this statutory claim on the Food Stamp Act and the regulations promulgated thereunder. They assert that the regulations prohibit HRS from releasing file information to the state attorney unless there is some reason to suspect fraud, notwithstanding that the state attorney may be "directly connected" with the enforcement of the Act, within the meaning of 7 C.F.R. § 272.1(c). Recipients also claimed violation of their constitutional rights to privacy, to freedom from unreasonable search and seizure, and to due process. Recipients sought damages arising from the release of the information and investigative activities that have occurred. Furthermore, recipients sought declaratory and injunctive relief to prevent HRS from releasing case files without any basis to suspect individuals of fraud, and to prevent the state attor-

ney from demanding access to food stamp case files in the absence of a proper referral of the case by HRS, or absent a search warrant.

The state attorney justified access to the food stamp files on the basis of the general investigative power of the office and because the office of state attorney is "directly connected" with the enforcement of the Act, pursuant to 7 C.F.R. 272.1(c).

The trial court, following a hearing and a finding of jurisdiction pursuant to 28 U.S.C. § 1337, denied recipients' motion for preliminary injunction. The trial court concluded that recipients were not substantially likely to prevail on their claim of violation of the Food Stamp Act and its regulations, and that they were not substantially likely to prevail on their claim of deprivation of constitutional rights. The trial court addressed the regulatory question first and concluded that because the state attorney is, pursuant to 7 C.F.R. § 272.1(c), "directly connected" with enforcement of the Food Stamp Act, HRS may release recipient files to him without regard to whether the recipients are suspected of committing fraud. The trial court obviously determined that such a conclusion was mandated by several factors, the most critical factor being the language contained in the Florida Food Stamp Application Form. That language states: "I authorize Division of Family Services and the Division of Public Assistance Fraud to verify any information given herein and to make any inquiry of past or present employers and records and financial or otherwise." Further, such language complies with Fla.Stat.Ann. 11.50(b). Additionally, the trial court noted that Fla.Stat.Ann. 409.355 makes public both the names of recipients of public assistance and the amount of assistance received. Finally, the trial court found that regulatory references, most notably 7 C.F.R. § 273.16(e)(2),[4] "en-

---

4. 7 C.F.R. 273.16(e)(2) provides:

 (e) *Court imposed disqualifications.*

 (2) *State agencies are encouraged to refer for prosecution under State or local fraud statutes those individuals suspected of committing fraud,* particularly if large amounts of food stamps are suspected of being fraudu-

lently obtained or the individual is suspected of committing more than one fraudulent act. The State agency shall confer with its legal representative to determine the types of cases which will be accepted for possible prosecution. State agencies shall also encourage State and local prosecutors to rec-

couraging the referral of suspected fraud cases to the State Attorney do not require the conclusion that the State Attorney may not act other than in referred cases."

As to the constitutional question, the trial court found that the Food Stamp Act provided certain protections for recipients' privacy, and following *Plante v. Gonzalez*, 575 F.2d 1119 (5th Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), balanced these privacy protections against the governmental interest in having unimpeded access to the files. The trial court determined that:

> there is a substantial governmental and public interest in the restricted disclosure of this information. The term restricted is used because there is no suggestion or contention that there is either desire or intention to make this information general public information or to extend its use or disclosure to other than those 'directly connected' with and who therefore have a legitimate official interest in its use. The governmental and public interest in such restricted disclosure is served in this use because fraud in the program is thereby curtailed, benefits are limited to those for whom they were intended and the public perception of the Food Stamp Program as a whole is changed from one described derisively as having recipients driving up in late model Cadillacs to pick up their food stamps to one recognized for serving the laudable purpose for which it was created. That there are instances of fraud should come as no surprise to anyone, but certainly the program should not be permitted to be publicly typified by those who abuse it. To this extent the government and the public have a vital interest in ferreting out those who do abuse the program and without access to the applications and reports, effective detection of fraud would be virtually impossible.

The trial court concluded that because recipients "had no protected privacy right

ommend to the courts that a disqualification penalty as provided in section 6(b) of the Food Stamp Act be imposed in addition to

in the information furnished," recipients would not face irreparable harm from HRS's planned release of information or from the state attorney's criminal investigations.

### ISSUES

Recipients ask us to determine:

1. whether the trial court erred in finding that the state attorney can subpoena and secure records of food stamp recipients, where the affected recipients are not suspected of fraud, because the state attorney is "directly connected" with the enforcement of the Food Stamp Program; and,

2. whether the trial court erred in holding that HRS's release of recipients' case files to the state attorney without reason to suspect fraud did not violate the recipients' constitutional right to privacy.

### STANDARD OF REVIEW

As we recently stated in *Shamloo v. Miss. State Bd. of Trustees, Etc.*, 620 F.2d 516, 524 (5th Cir. 1980):

> This court clearly established the requirements for granting a preliminary injunction in *Canal Authority of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974) as follows:
>
> ... (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may to do defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

Id. at 572. The grant or denial of a preliminary injunction rests in the discretion of the district court. *Johnson v. Radford*, 449 F.2d 115 (5th Cir. 1971). We must determine whether the district court abused its discretion as bounded by the four prerequisites of *Canal Authority*.

any other civil or criminal fraud penalties. [Emphasis added.]

*Farshy v. Kagan,* 585 F.2d 749 (5th Cir. 1978).

The above four requirements considered by the trial court are mixed questions of law and fact and "[o]n review the district court's findings of fact are to be upheld unless 'clearly erroneous.' Fed.R.Civ.P. 52(a). The district court's conclusions of law [however] are subject to broad review and will be reversed if incorrect." *Buchanan v. United States Postal Service,* 508 F.2d 259, 267 n. 24 (5th Cir. 1975).

## DISCUSSION

### I. The Regulatory Claim

#### A. Congressional Intent

 Resolution of this issue turns upon our construction of the Food Stamp Act and the regulations thereunder. As noted by the Supreme Court, "our task is to interpret the words of these statutes [and regulations] in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).

The trial court found "that the State Attorney is within that category of persons 'directly connected' with the enforcement of the Food Stamp Act and is entitled to access to the recipient files for use in the enforcement of the Act." The trial court interpreted a finding of "directly connected" to be a finding of a right to complete access to recipient files. Such an interpretation ignores the possibility that those "directly connected" with the administration or enforcement of the Act might be re-

stricted in their use and disclosure of program information. We reject the trial court's approach as too limited when the entire Act and regulatory structure is considered.

When a household applies for food stamps, the completed application contains a large amount of personal information concerning the household's circumstances. This information is reviewed by the food stamp certification caseworker, in an "official and confidential discussion of household circumstances," with the applicant's "right of privacy" protected during this interview. 7 C.F.R. § 273.2(e).[5]

Verification is the process of confirming the household statement about factors of eligibility through either documentary sources, collateral (third–party) contacts, or a home visit. The areas of verification and the means of verification are not left to the discretion of the certification worker. Pursuant to 7 C.F.R. § 273.2(f),[6] in the absence of consent from the household, a certification worker is not free to verify any factor of eligibility or to make contacts with third persons in order to verify information provided by the household.

The federal regulations governing verification expressly distinguish between factors of eligibility for which verification is mandatory (gross non–exempt income, alien status, utility and medical expenses), and all other factors of eligibility. For non–mandatory factors, the state agency, here HRS, can only require verification if the household's assertions are "questionable." 7 C.F.R. § 273.2(f)(1) and (2).[7] Thus, if the

---

**5.** 7 C.F.R. § 273.2(e) provides, in pertinent part: The interview shall be conducted as an official and confidential discussion of household circumstances. The applicant's right to privacy shall be protected during the interview. Facilities shall be adequate to preserve the privacy and confidentiality of the interview.

**6.** 7 C.F.R. § 273.2(f) provides, in pertinent part: (f) *Verification.* Verification is the use of third–party information or documentation to establish the accuracy of statements on the application.
(1) *Mandatory verification.* State agencies shall verify the following information prior to certification for households initially applying:

 (i) *Gross nonexempt income ....*
 (ii) *Alien status ....*
 (iii) *Utility expenses ....*
 (iv) *Medical expenses ....*

**7.** 7 C.F.R. § 273.2(f)(2) provides, in pertinent part:
 (2) *Verification of questionable information. With the exception of liquid resources and loans, State agencies shall verify all other factors of eligibility prior to certification only if they are questionable and affect a household's eligibility or benefit level.* Procedures for verifying loans and liquid resources are described in paragraph (3) of this

caseworker has no reason to believe that the household's assertions are questionable regarding a non–mandatory factor, household composition for example, the caseworker cannot require verification of this factor. 7 C.F.R. § 273.2(f)(2) and (i).[8]

Where verification is allowed or required, the nature of verification is not left to caseworker discretion. The primary source of verification is documentary evidence provided by the household. 7 C.F.R. § 273.-2(f)(4).[9] If the household is unable to provide acceptable documentary verification, the caseworker may make use of a collateral contact. The caseworker, however, is first required to ask the household to name and agree to a mutually acceptable collateral contact. 7 C.F.R. § 273.2(f)(5).[10] If the

section. To be considered questionable, the information on the application must be inconsistent with statements made by the applicant, inconsistent with other information on the application or previous applications, or inconsistent with information on the application or previous applications, or inconsistent with information received by the State agency. When determining if information is questionable, the State agency shall base the decision on each household's individual circumstances. A household's report of expenses which exceed its income may be grounds for a determination that further verification is required. However, this circumstance shall not, in and of itself, be grounds for a denial. The State agency shall instead explore with the household how it is managing its finances, whether the household receives excluded income or has resources, and how long the household has managed under these circumstances. Procedures described below shall apply when information concerning one of the following eligibility requirements is questionable: [Emphasis added.]

8. 7 C.F.R. § 273.2(f)(2)(i) provides:

(i) *Household composition. If questionable*, State agencies shall verify any factors affecting the composition of a household such as household size and boarder status. However, due to the difficulty in verifying whether or not a group of individuals customarily purchases and prepares meals together and, therefore, constitutes a household, State agencies shall generally accept the household's statement regarding food preparation and purchasing. [Emphasis added.]

9. 7 C.F.R. § 273.2(f)(4) provides:

(4) *Sources of verification.* (i) *Documentary evidence.* State agencies shall use documentary evidence as the primary source of verification. Documentary evidence consists of a written confirmation of a household's circumstances. Examples of documentary evidence include wage stubs, rent receipts, and utility bills. Although documentary evidence shall be the primary source of verification, acceptable verification shall not be limited to any single type of document and may be obtained through the household or other source. Whenever documentary evidence

cannot be obtained, State agencies shall use alternate sources of verification such as collateral contacts and home visits.

(ii) *Collateral contacts.* A collateral contact is a verbal confirmation of a household's circumstances by a person outside of the household. The collateral contact may be made either in person or over the telephone. The acceptability of a collateral contact shall not be restricted to a particular individual but may be anyone that can be expected to provide an accurate third–party verification of the household's statements. Examples of acceptable collateral contacts are employers, landlords, social service agencies, migrant service agencies, and neighbors of the household.

(iii) *Home visits.* Home visits shall be used as verification only if documentary evidence cannot be obtained, and the visit is scheduled in advance with the household.

(iv) *Discrepancies.* Where information from another source contradicts statements made by the household, the household shall be afforded a reasonable opportunity to resolve the discrepancy prior to an eligibility determination.

10. 7 C.F.R. § 273.2(f)(5) provides:

(5) *Responsibility for obtaining verification.* (i) The household has primary responsibility for providing documentary evidence to support its income statements and to resolve any questionable information. Households may supply documentary evidence in person, through the mail, or through an authorized representative. The State agency shall accept any reasonable documentary evidence provided by the household and shall be primarily concerned with how adequately the verification provides the statements on the application. If it would be difficult or impossible for the household to obtain the documentary evidence in a timely manner, the State agency shall offer assistance to the household in obtaining the documentary evidence, except as otherwise stated in this section.

(ii) Whenever documentary evidence cannot be obtained, the State agency shall substitute a collateral contact or a home visit. The State agency shall rely on the household to provide the name of any collateral contact.

household unreasonably refuses to provide acceptable collateral contact verification, the application can be rejected or the case terminated. The caseworker, however, cannot proceed to contact a third party for verification without the permission of the household. We base this view of 7 C.F.R. § 273.2(b)(5) on the Department of Agriculture comments that accompanied promulgation of this section.

Many commentors recommend that the regulations prohibit the use of a collateral contact without the express written consent of the household. Since the proposed regulations clearly state that the state agency must rely on the household to provide the name of a collateral contact, the Department believes the recommended change is unnecessary. 43 Fed. Reg. 47856, (Tuesday, October 17, 1978).

When a collateral contact is necessary, the regulations establish a balance between the state agency's right to ensure that only eligible persons receive food stamps and the household's right to maintain its privacy and dignity. Congress recently expressed its awareness of this dilemma and emphasized the need to ensure protection of recipient privacy rights.

The legal barriers that need to be lowered, or in some instances withdrawn entirely, are substantial, appropriately so in light of the privacy considerations involved and the danger of abuse of confidential information for illegitimate purposes by both federal and state food stamp personnel. The Program need for certain information is great, but it must be carefully balanced by the need to protect needy individuals from having their privacy bartered away in order to assuage their hunger. Existing protections should not be reduced without careful consideration and without the substitute

of other meaningful safeguards. The committee's bill attempts to achieve this balanced approach to disclosure of relevant wage and benefit information.

H.R. Rep. 96–788, Food Stamp Act Amendments of 1980, at 106.

The balance between the household's privacy rights and the need to investigate household statements to ensure accuracy shifts after there is reason to suspect the household has provided incorrect information to the Food Stamp Program. This suspicion may arise in a number of ways. The recipient may submit inconsistent or questionable information during regular redeterminations of eligibility; an informant may provide information which contradicts representations made by the households; regular computer checks of information given to the Aid to Families with Dependent Children program or the Social Security program may reveal inconsistent reporting. At any point when the information provided by the household to the Food Stamp Program appears questionable, the state worker can require an additional document or verification and, if that verification is inadequate, a collateral contact. 7 C.F.R. § 273.2(f). If the information continues to be suspect, or the household refuses to cooperate, a fraud investigation may be appropriate.

The regulations authorize referral to state prosecuting authorities in cases where individuals are suspected of committing fraud. 7 C.F.R. § 273.16(e)(2).[11] This regulation is the sole reference in the Food Stamp Act and regulations providing a case file to a state prosecutor; and 7 C.F.R. § 273.16(e)(2) carefully limits referral to "cases where individuals are suspected of committing fraud." The careful limitation on information disclosure throughout the

The household may request assistance in designating a collateral contact. The State agency is not required to use a collateral contact designated by the household if the collateral contact cannot be expected to provide an accurate third–party verification. *When the collateral contact designated by the household is unacceptable, the State agency shall ask the household to designate*

*another collateral contact.* The State agency is responsible for obtaining verification from acceptable collateral contacts.

The State agency shall not require the household to personally present verification at a food stamp office. [Emphasis added.]

11. Refer to n. 4.

regulatory structure, the qualified language of 7 C.F.R. § 273.16(e)(2), and the absence of any reference to providing case files to prosecuting authorities anywhere else in the regulatory structure, leads to the conclusion that the state agency cannot release a file to a prosecutor until the agency determines there is reason to suspect fraud. Further, we find it relevant that § 273.16(e)(2) encourages referral only for "prosecution," not investigation. This is not to say, of course, that, upon referral, the state attorney cannot make use of certain investigative tools, like the grand jury.

Clearly, Congress intended to establish a structure where the state agency can contact third persons to verify information, and engage in investigations, only after the household has provided questionable information. After establishing such a careful structure, Congress did not intend that it be circumvented by allowing the agency to turn over the files to the prosecutor for criminal investigation at any time, without regard to whether the household has engaged in questionable behavior. Given this regulatory structure, and the clear intent of Congress, we must disagree with the trial court, since it effectively held that by the simple expedient of turning over all case files to a state attorney, HRS may accomplish indirectly the verification which it is barred from doing by the federal food stamp regulations.

In resolving any ambiguity in the regulatory structure at the Food Stamp Program, it is useful to examine the Department of Health and Human Resources' interpretation of the substantially similar "use or disclosure" provision of the Aid to Families with Dependent Children Program, 42 U.S.C. §§ 601–662. Health and Human Resources, in administering the AFDC program, has interpreted its "use or disclosure" provision in a manner which clearly forbids the indiscriminate release of case files by a state agency to a state prosecutor without any basis to suspect fraud. Health and Human Resources advised Congress that:

> although a well–run state welfare program could turn up most cases of welfare fraud, it is not possible for the state or local welfare agency to identify all such cases. Where law enforcement officials identify a case of suspected welfare fraud which has gone undetected by the welfare agency and wish to take action there is no federal statutory provision or HEW [HHR] regulation which prevents a statewide welfare agency from disclosing information bearing on the question of welfare fraud to those officials. Disclosure of information unrelated to the suspected fraudulent conduct is, of course, both unnecessary and undesirable, and the welfare agency therefore has the responsibility to make available from the case file only such information as is needed for the investigation of the fraudulent activity in question. Also, it would be administratively disruptive and a violation of the legislatively mandated principle of confidentiality to permit unlimited access to all case files when the law enforcement officials have no specific instance of welfare fraud in mind, but merely suspect that such fraud exists generally in the program.

"Establishing Priorities among Programs Aiding the Poor," Hearing before the Senate Finance Committee, 92d Cong., Second Sess. at 149 (Feb. 15, 1972).

It is also worth noting that 45 C.F.R. § 235.110, the Health and Human Resources equivalent of Agriculture's 7 C.F.R. § 273.-16(e), provides for referral to law enforcement officials in situations "in which there is valid reason to suspect that fraud has been practiced." In *United States v. McDaniels*, 370 F.Supp. 293 (E.D.La.1973), the court interpreted this provision as barring referral of a case file when there is no basis to suspect fraud. There, the court stated that:

> The HEW Regulation with respect to suspected fraud contemplates some preliminary investigation by the agency before a case is turned over to a law enforcement officer. Each state plan must provide methods and criteria for identifying situations in which a question of fraud may exist. That procedures must be developed for referral to law enforcement offi-

cers of "situations in which there is valid reason to suspect that fraud has been practiced" implies that cases where "valid reason" does not exist will not be referred. This conclusion is buttressed by the express provision that the state agency plan (not its law enforcement program) must provide "For methods of investigation of situations in which there is a question of fraud . . . ."

370 F.Supp. at 296.

This prohibition on blanket release of files by the state agency, which exists in the AFDC Program, is precisely what HRS denies exist in the Food Stamp Program. There is no reason, however, to believe that Congress intended any less protection for the low–income households who receive federal food assistance than for the low–income households who receive federal financial assistance. Indeed, millions of households receive both food stamps and AFDC benefits, and pursuant to 7 C.F.R. § 273.-2(j),[12] state agencies are required to develop procedures for a single application and interview when a household is eligible for both programs. Much of the information regarding household income, resources, and composition is necessary for both eligibility determinations. It is inconsistent to say that Congress intended to bar the state agency administering the AFDC Program from giving a prosecuting authority the AFDC file without valid reason to suspect fraud, but intended to allow the state agency to turn over the food stamp file without restriction. We need not interpret either of the regulations in a manner

which results in the same congressional language leading to inconsistent protections. Accordingly, we find that Congress intended the state agency administering the Food Stamp Program to turn over case files to a state prosecutor only when there is valid reason to suspect fraud in the particular household.

Contrary to the trial court's holding, a finding that the state attorney is "directly connected" with the enforcement of the Food Stamp Act does not compel the conclusion that HRS may release all files of all persons receiving food stamps to that state prosecutor. The state attorney contends he gets his power to investigate because he is, pursuant to 7 C.F.R. § 272.1(c), "directly connected" with the enforcement of the Act; the state attorney then disassociates himself from the other regulations limiting investigative authority. If the state attorney is "directly connected" with enforcement of the Act, then he is also bound by those provisions restricting his authority to investigate.

The trial court, in concluding that HRS could refer case files to the state attorney for investigation of their eligibility, expressly relied upon aspects of state law and practice. The trial court relied upon a waiver provision of Florida's food stamp application. It also relied upon Fla.Stat. Ann. § 409.355 which provides, in part, that "the lists of names of all persons who have received public assistance payments and the amount of such payments are a matter of public record."

---

**12.** 7 C.F.R. § 273.2(j) provides, in pertinent part:

 (j) *PA and GA households.* Households in which all members are applying for public assistance (PA) shall be allowed to apply for food stamp benefits at the same time they apply for PA benefits. These households' food stamp eligibility and benefit levels shall be based solely on food stamp eligibility criteria, and the households shall be certified in accordance with the notice, procedural and timeliness requirements of the food stamp regulations. Households in which all members are applying for State agency administered general assistance (GA) shall, at a minimum, be provided with applications for food stamp benefits and be referred to the appro-

priate food stamp office for an eligibility determination. Under certain circumstances, these households may be able to apply jointly for their GA and food stamp benefits.

 (1) *PA households.* (i) The application for AFDC or other public assistance shall contain all the information necessary to determine a household's food stamp eligibility and level of benefits. Information relevant only to food stamp eligibility shall be contained in the PA form or shall be an attachment to it. The PA application shall have a place for the household to indicate if it does not wish to apply for food stamps.

 . . . .

Refer also to n. 3, 7 U.S.C. § 2020(i).

Federal regulations clearly prohibit HRS from requiring verification of a number of factors of eligibility when the applicant has not provided "questionable" information. 7 C.F.R. § 273.2(f)(1), (2). Federal regulations prohibit the requirement of collateral contacts when documentary verification is adequate, and prohibit the state agency from engaging in collateral contacts absent the household's consent. 7 C.F.R. § 273.2(f)(4), (5).

This limitation on agency discretion and the verification process demonstrates an awareness by Congress and the Department of Agriculture that, absent carefully structured limits on the state agency's ability to verify, the verification process can be used to harass or delay eligibility determinations for applicant households. The Food Stamp Amendments of 1980 broadened the rights of state agencies to verify information provided by "error–prone" households. In developing a model by which those households which are more subject to error are also subject to increased verification, Congress expressly rejected the option of allowing states to verify any factors of eligibility for any or all households. In rejecting this option, the House Agriculture Committee noted "the carefully maintained balance between verification that reduces costly program error and verification that harasses applicants and prevents participation without impacting on error ..." H.R. Rep. 96–788, Food Stamp Amendments of 1980, at 98.

The Food Stamp Act also expressly prohibits a state agency participating in the Food Stamp Program from levying additional eligibility requirements for applicant households. 7 U.S.C. § 2020(e)(5).[13] Additionally, the Food Stamp Act expressly requires the state agency to undertake certification of applicant households in accordance with the procedures prescribed in the federal regulations. 7 U.S.C. § 2020(e)(6).[14]

It is not necessary for us to resolve whether Florida law and practice conflict with federal law. The question of the constitutionality of Florida law and practice is not specifically before us. Our only necessary task is to interpret the Act and accompanying regulations in view of the purposes Congress sought to serve. This we have done. We do note that a court does not give intent to congressional purpose by reference to state law and practice.

Our interpretation of the Act and regulations results in a finding that HRS cannot release files to a state prosecutor in the absence of a basis to suspect fraud. Such an interpretation in no way impedes the state attorney, a constitutionally authorized body, from investigating fraud. Our interpretation merely prohibits the state attorney from conducting a fishing expedition in food stamp files. Whenever the state attorney has reasonable suspicion to suspect fraud in a particular case file, he may request that file and conduct a normal fraud investigation. The state attorney may also conduct normal fraud investigations of "those individuals suspected of committing fraud," referred to the state attorney by HRS, pursuant to 7 C.F.R. § 273.16(e)(2).

Accordingly, there is a substantial likelihood that recipients will prevail on the merits of their regulatory claim. Further, the injunction will not harm either HRS or the state attorney. Nor will the injunction be adverse to the public interest. The injunction will not alter the normal process of investigation and prosecution of food stamp fraud.

### B. Irreparable Harm

■ As mentioned, the trial court determined "from the language of 7 C.F.R. § 272.1(c), that the legislature intended to

---

**13.** 7 U.S.C. § 2020(e)(5) provides:

> (5) the specific standards to be used in determining the eligibility of applicant households which shall be in accordance with sections 5 and 6 of this Act [7 U.S.C. §§ 2014, 2015] and shall include no additional requirements imposed by the State agency.

**14.** 7 U.S.C. § 2020(e)(6) provides, in pertinent part:

> (6) that (A) the State agency shall undertake the certification of applicant households in accordance with the general procedures prescribed by the Secretary in the regulations issued pursuant to this Act.

provide some degree of confidentiality of the personal information of the food stamp recipients by preventing general public disclosure or disclosure to persons not directly connected with the program."

We agree with the trial court that the Act and accompanying regulations give recipients statutory protection from disclosure of confidential information. As such, recipients possess a legitimate expectation that the information will be kept confidential. Certainly, recipients do not legitimately expect local police officers to peruse their food stamp files. This court has held that "[w]hen a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages. Privacy of personal matters is an interest in and of itself, protected constitutionally, as discussed above, and at common law." *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978), *cert. denied*, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979).

The trial court, therefore, erred in finding no irreparable harm.

### II. The Constitutional Claim

Recipients assert that HRS's release of their food stamp files to the state attorney without reason to suspect fraud violated their constitutional right to privacy.

This court has a policy of deciding cases on the narrowest legal grounds available. *Shamloo v. Miss. State Bd. of Trustees, Etc.*, 620 F.2d 516 (5th Cir. 1980); *Penthouse International Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir. 1980). This policy is particularly applicable where, as here, constitutional questions are involved. As Justice Frankfurter wrote, "[i]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality unless such adjudication is unavoidable." *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944).

In this case, recipients seek reversal of a denial of a motion for preliminary injunction. Our holding concerning recipients' regulatory claim is sufficient to reverse the denial. Consequently, we need not decide the constitutional claim.

### CONCLUSION

■ The trial court abused its discretion in denying the preliminary injunction. There is a substantial likelihood that recipients will prevail on the merits. Based on *Plante v. Gonzalez*, recipients have suffered irreparable injury and will continue to suffer injury unless the injunction is granted. Granting the injunction will not be adverse to the public interest; nor will granting the injunction harm either HRS or the state attorney.

Accordingly, the trial court's order denying the preliminary injunction is vacated, the judgment is reversed, and the cause is remanded to grant a preliminary injunction, consistent with this opinion, enjoining HRS from releasing food stamp files to the state attorney absent any basis to suspect that the affected households have committed fraud.

### REVERSED AND REMANDED.

JAMES C. HILL, Circuit Judge, concurring specially:

I concur specially in the result reached by the majority but wish to point out several troublesome aspects of the case and the majority's handling of it. The appellees have argued persuasively that there is a need to verify information supplied by food stamp recipients to program administrators in Florida by suggesting in their brief that fraud may be involved in as many as 40 percent of all food stamp cases. The type of verification that appellees sought to conduct was fairly standard; ostensibly, it was no more intrusive or violative of privacy than typical verification procedures used by banks in approving loan applicants or employers in considering job applicants. While such a procedure might reveal fraud, or even deter fraud, I would not conclude, as does the majority, that the households whose entitlements were being verified "were subjected to criminal investigations," *ante*, at 1205–1206.

Although it would seem that a verification procedure such as that urged by appel-

lees would ultimately benefit those persons truly in need of food stamps and legally entitled to them,[1] it is clear that the *desirability* of such a procedure is not an issue for our determination. Our function is to determine whether, under the laws passed by Congress and under the regulations properly promulgated by the various administrative agencies, this type of verification procedure can be undertaken. I conclude, along with the majority, *see ante,* at 1208–1211, that Congress through the Food Stamp Act, 7 U.S.C. §§ 2011–2027 (1976), and the Department of Agriculture though its regulations, *e.g.* 7 C.F.R. § 272 (1979), have precluded the action that appellees seek to take.

The results reported to us at oral argument, *see* note 1 *supra*, suggest that further study of the legislative policy involved in this case is warranted. But if another course is to be chosen, the fine men and women who have been elected to represent the people are quite competent to the task. The judiciary should neither assume the responsibility nor usurp authority not delegated to it. *See Wilson v. First Houston Investment Corp.,* 566 F.2d 1235, 1244 (5th Cir. 1978) (Hill, J. dissenting).

---

1. We were advised at oral argument that in one county involved verification procedures were conducted in a total of 350 cases. Of those, 61 arrests for fraud in procurement of food stamps resulted. The conviction rate was said to be approximately 90–91 percent.