John E. WILKES, 1813 Holly Oaks Lake Road, East Jacksonville, Florida, Plaintiff,

v.

INTERNAL REVENUE SERVICE JACKSONVILLE DISTRICT, 400 W. Bay Street, Jacksonville, Florida, Defendant.

No. 80–959–Civ–J–B.

United States District Court, M. D. Florida, Jacksonville Division.

Jan. 23, 1981.

Lawrence K. G. Poole, Asst. Counsel, National Treasury Emp. Union, Atlanta, Ga., for plaintiff.

Robert S. Yerkes, Asst. U. S. Atty., Jacksonville, Fla., Nancy M. Floreen, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant.

## OPINION

SUSAN H. BLACK, District Judge.

This is an action for declaratory and injunctive relief under the First Amendment. The complaint alleges subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 2201.

### I. The Factual Background

Plaintiff, John Wilkes, is an employee of the Jacksonville District of the Internal Revenue Service (hereinafter "IRS"). In August, 1980, Wilkes wrote a letter to the District Director complaining of the disdainful attitude toward taxpayers displayed by a supervisor of revenue officers in the Collection Division. Plaintiff furnished the letter and accompanying affidavits to the Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs of the United States Senate, which had held a hearing in late July on IRS collection practices. The Subcommittee was concerned with complaints by small businesses of excessive use of summary collection powers by the IRS, and issued a report concluding that the IRS had, in fact, abused those powers. Staff of Senate Comm. on Governmental Affairs, 96th Cong., 2D Sess., Report on Internal Revenue Service Collection Practices 3 (Comm. Print 1980).

On or about September 23, 1980, plaintiff gave an interview to a staff reporter of the *St. Petersburg Times* concerning the collection practices of the Jacksonville District and some of the supervisors' attitudes toward taxpayers. The interview was published in an article in the *Times* which appeared on October 16, 1980. In the interview, plaintiff corroborated many of the Senate Subcommittee findings and related his own experiences with the IRS.

On October 20, 1980, plaintiff's supervisor, Mr. Van O'Neal, Chief of the Special Procedures Staff, summoned plaintiff to his office and directed plaintiff to read a document, "DIR–JAX Memorandum No. 1 (19)–3 Revision No. 1," which plaintiff asserts was highlighted at section 6.03: "Managers, Director's Representatives or employees will not call press conferences, prepare news releases or volunteer information to the news media without prior direction or clearance from the Public Affairs Officer or District Director."

On October 22, 1980, plaintiff had an interview with Mr. Anthony Versis, Chief of Labor-Management Relations for the

Jacksonville District. Plaintiff alleges that Mr. Versis questioned him about how he came to give the interview to the *St. Petersburg Times*, indicated that management was upset about the matter, and told him that some action would have to be taken against him to discourage other employees from giving similar press interviews.

On October 24, 1980, plaintiff received a memorandum from Mr. Bruce Strauss, Chief of the Collection Division of the Jacksonville Division, identifying sixteen statements in the *St. Petersburg Times* article and asking plaintiff for the specific information (including case names where applicable) on which each statement was based. Plaintiff was given four days to respond. Extensions of time for response were to be sought in writing.

On October 27, 1980, plaintiff filed this action seeking a temporary restraining order forbidding the IRS from requiring him to respond to the Strauss memorandum of October 24. Plaintiff claimed that the memorandum was a retaliation against him for the exercise of his First Amendment rights in giving an interview to the *St. Petersburg Times*. Based on his experience as a steward in the National Treasury Employees Union, plaintiff viewed the memorandum as a tool by which management sought evidence of insubordination against him. He also alleged that § 6.03 of the "DIR–JAX Memorandum" is an unconstitutional prior restraint in that it conditions the exercise of protected expression on administrative permission. Finally, he alleged that his conversations with Mr. O'Neal and Mr. Versis amounted to threats of discipline which "chilled" the exercise of his First Amendment rights, even absent any overt disciplinary action by management. Plaintiff says that he has felt restrained from giving further press interviews since the time of those conversations.

The Court did not issue a temporary restraining order. Plaintiff obtained an extension of time in which to answer the Strauss memorandum and completed it as required.

Following denial of a temporary restraining order, the cause came on for trial on November 25, 1980, at which time the Court heard evidence relating to plaintiff's motion for temporary and permanent injunctions and for a declaratory judgment. Counsel were given the opportunity to submit reply briefs after trial, and the Court heard final argument on December 18, 1980.

## II. Findings of Fact

At trial, the Court heard testimony from the plaintiff, from Mr. Versis and from Mr. Charles DeWitt, Director of the Jacksonville District Office of the IRS since 1974.

Plaintiff recounted the circumstances giving rise to this suit, claiming specifically that Mr. Versis said to him during their conversation of October 22, "We'll have many opportunities to discuss this matter, both formally and informally." Tr. at 57. Plaintiff's union experience led him to associate a "formal" conversation with formal disciplinary proceedings, a conclusion reinforced by the fact that he was the only employee in the Jacksonville District office on October 24 to receive a memorandum of the kind delivered by Mr. Strauss, and further reinforced by Mr. O'Neal's presentation to plaintiff of the "DIR–JAX Memorandum" with § 6.03 allegedly highlighted.

On cross-examination plaintiff conceded that since the *St. Petersburg Times* interview he has received no written notice of any forthcoming disciplinary action against him. Neither at the time Mr. O'Neal showed him § 6.03 nor since then has Mr. O'Neal made any statement to him regarding disciplinary action. Tr. at 67.

For his part, Mr. Versis denied saying that management would take action against plaintiff for giving the *Times* interview. Tr. at 89. He said that he never recommended to management that plaintiff be restrained from talking to the press, Tr. at 92, that he had no personal authority to take or recommend disciplinary action, Tr. at 86–7, and was of the opinion that such a press interview as plaintiff gave to the *Times* would not be enough to justify disciplinary action in any event. Tr. at 88.

Mr. DeWitt testified that the "DIR–JAX Memorandum" only applies to employees acting as official spokesmen for the IRS. He said that he knew of no one who had ever been disciplined on the basis of the Memorandum during his six-year tenure as District Director. Tr. at 84. Plaintiff did not cross-examine Mr. DeWitt.

◼ The Court finds that the three incidents on which this complaint is based—the conversations with Messrs. O'Neal and Versis and the memorandum from Mr. Strauss—constituted neither disciplinary action nor credible threats of it. While plaintiff's experience with the Treasury Employees Union may have led him to associate a Strauss-type memorandum with imminent institution of disciplinary proceedings, that experience should also have led him to realize that Mr. Versis had the authority neither to recommend discipline nor even represent management's position on the issue. Plaintiff argues that, taken in context, the events of October 16–24 would plausibly suggest to a person in his situation that trouble was brewing. The Court finds the plaintiff to be a thoughtful and sensitive person who was aware of the serious nature of his allegations about the IRS. That same sensitivity caused him to overreact to the events following publication of his interview in the *St. Petersburg Times*. The Court finds that nothing said or done at that time or since then reasonably suggests that plaintiff was or is to be disciplined for approaching the press with his story.

### III. Conclusions of Law

◼ a. *Injunctive Relief*. The requirements for issuance of a preliminary injunction are well-known and involve balancing the threat of irreparable injury to the plaintiff with whatever harm the requested relief will cause to the defendant or the public interest. The grant or denial of a preliminary injunction rests in the discretion of the trial court. Plaintiff must clearly carry his burden of persuasion before this "extraordinary and drastic remedy" is granted. *Canal Authority of the State of*

*Florida v. Callaway*, 489 F.2d 567, 572–3 (5th Cir. 1974).

◼ Where First Amendment rights are at stake, courts must be especially sensitive to claimed infringement. This is particularly true in the case of alleged prior restraints, which have long been disfavored in American law and bear a heavy presumption of unconstitutionality. *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971); *Bernard v. Gulf Oil*, 619 F.2d 459, 467 (5th Cir. 1980).

◼ Before the balancing process outlined in *Canal Authority, supra*, can be undertaken, however, and in spite of the fundamental nature of the rights at stake, the Court must be able to tailor a decree to enjoin specific conduct. Rule 65(d), F.R. Civ.P., requires that "Every order granting an injunction ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained ...." This requirement of specificity, "based in part on notions of basic fairness, ensures that individuals against whom an injunction is directed receive explicit notice of the precise conduct that is outlawed." *Alabama Nursing Home Association v. Harris*, 617 F.2d 385, 387–8 (5th Cir. 1980). *Cf. Payne v. Travenol Laboratories*, 565 F.2d 895 (5th Cir. 1978), *cert. denied* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1979) (prohibition against "discriminating" on basis of color, race or sex amounted to "obey the law" injunction, held unenforceable for lack of specificity); *Wynn Oil Co. v. Purolator Chemical Corp.*, 536 F.2d 84 (5th Cir. 1976) (injunction restraining defendants from "slandering and disparaging the Wynn Oil Co. and its products" held impermissibly vague); 7 *Moore's Federal Practice* ¶ 65.11.

In his post-trial brief, plaintiff concedes that his request for a restraining order against completion of the Strauss memorandum is now moot. He suggests that a preliminary injunction would also be moot.

However, he reiterates his request "to have Defendant enjoined from making any threats against Plaintiff and from restraining employees in the exercise of their First Amendment rights." Pl. Posthearing Brief at 10. Reference to the original complaint does little to elaborate the nature of the relief sought. Plaintiff seeks to have the Court "enjoin Defendant . . . from engaging in any prior restraint on the exercise of free speech," from "engaging in any act of reprisal against an employee for exercising the right of free speech," and from "threatening employees with reprisals for exercising their Constitutional right of free speech."

■ Enjoining "prior restraint" is like enjoining slander, *Wynn Oil, supra,* and gives no one notice of conduct which may subject him to the contempt power of the Court. Nor can an injunction issue against threats or reprisals which are not apparent. In light of the testimony adduced at trial, the Court will deny plaintiff's motion for permanent injunction.

b. *Declaratory Relief.* Plaintiff's claim for declaratory relief is distinct from the injunction count, since it is the very existence of the "DIR–JAX Memorandum," apart from any disciplinary action pursuant to it, on which plaintiff bases his allegations of "chill." For the reasons set forth below, however, the Court finds this claim premature.

Defendant moves to dismiss this aspect of the suit as non-justiciable, relying in large part on *National Treasury Employees Union v. Kurtz,* 600 F.2d 984 (D.C.Cir.1979). *Kurtz* involved a nearly identical set of facts to the instant case. The President of the NTEU had issued a press release based on information supplied by an IRS employee criticizing the IRS for the high cost of its office renovation in Dallas. The charges found their way into the *Federal Times.* The IRS then issued a memorandum reminding employees to avoid improper disclosure pursuant to IRS personnel rules and requiring employees to clear press statements with their superiors. The NTEU challenged the facial constitutionality of both the rules and the memorandum as illegal prior restraints and overbroad regulation of protected speech. The Court affirmed a dismissal of the action on the strength of its earlier decision in *National Student Association v. Hershey,* 412 F.2d 1103 (D.C.Cir.1969).

The *Hershey* court had "reasoned that, once plaintiffs plausibly alleged vulnerability to the alleged chilling effect, three considerations were relevant: (1) the severity and scope of the alleged chilling effect on First Amendment freedoms; (2) the likelihood of other opportunities to vindicate infringed rights with promptness; and (3) the need for factual referents to properly define and narrow the issues . . . , 412 F.2d at 1115," 600 F.2d at 988. In *Kurtz,* plaintiffs' complaint could pinpoint no particular injury: the union had issued the subject press release, and feared that the IRS memorandum in response might somehow chill free expression among unspecified union members. The first of the *Hershey* criteria mandated dismissal, since "[n]owhere does the complaint state that any employee has been subjected to adverse action or threats of such action, *nor does it allege that the existence of the regulation has prevented employees from exercising protected rights.*" 600 F.2d at 989 (emphasis added). The Fifth Circuit used similar language when it dismissed as non-justiciable the complaint of a Georgia police officer who claimed that he had been dismissed on the basis of unconstitutional personnel regulations.

In the case of regulations governing speech or conduct, a threat of interference with rights of the plaintiff beyond that implied by the mere existence of the regulations must be shown. *United Public Workers v. Mitchell,* 330 U.S. 75, 90–91 [67 S.Ct. 556, 564–65, 91 L.Ed. 754] . . . (1947). Officer Smith's challenge to the regulations which were not asserted as a basis for his discharge is non-justiciable because he has suffered no injury from them beyond the mere fact that they exist; *Smith has never claimed that he desired to engage in activity violative of those regulations.*

*Smith v. Price,* 616 F.2d 1371, 1379–80 (5th Cir. 1980) (emphasis added).

■ There is a clear distinction between the instant case and the situation in *Kurtz* and *Smith v. Price, supra.* Plaintiff in the instant case has been careful to allege and to testify to his own sense of being restrained from giving further interviews to the press and broadcast media following Mr. O'Neal's presentation to him of § 6.03 of the "DIR–JAX Memorandum." Tr. at 66. Insofar as *Kurtz, supra,* is a dismissal on the pleadings, it is not pertinent here. Plaintiff has sufficiently *alleged* a "chill" and, with it, a "case or controversy."

■ The plaintiff has not proven his "case," however. In so concluding, the Court notes the elusive character of a "case or controversy" sufficiently "live" to confer subject-matter jurisdiction on a federal court. The Supreme Court recognized the difficulty in *Golden v. Zwickler,* 394 U.S. 103, 108, 110, 89 S.Ct. 956, 959, 960, 22 L.Ed.2d 113 (1969):

> "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, [61 S.Ct. 510, 512, 85 L.Ed. 826] (1941).
>
> . . . .
>
> The constitutional question, First Amendment or otherwise, must be presented in the context of a specific live grievance. In *United Public Workers of America v. Mitchell,* [330 U.S.] at 89–90, [67 S.Ct. at 564], we said: "The power of courts, and ultimately of this Court, to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough."

*Cf. Martin Tractor Co., et al. v. Federal Election Commission,* 627 F.2d 375, 386–7 (D.C.Cir.1980); *Wolfer v. Thaler,* 525 F.2d 977, 979 (5th Cir.), *cert. denied* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 800 (1976).

It seems clear after trial that the threat in this case is hypothetical only. Plaintiff as much as concedes that there remains (if there ever existed) no live dispute between him and the IRS: he calls the limitations on applicability of the "DIR–JAX Memorandum" set out in Mr. DeWitt's testimony "completely appropriate." Pl. Posthearing Brief at 9. Since Mr. DeWitt testified that the Memorandum was meant to apply only to employees speaking officially for the Service, plaintiff's acknowledgment of the Memorandum's limited scope makes any fear of discipline or retaliation pursuant to § 6.03 unreasonable. As the official position of the IRS, Mr. DeWitt's testimony undercuts the specific ground of this suit.

■ By the terms of his original complaint, however, plaintiff would have the Court invalidate the provisions of the "DIR–JAX Memorandum" wholesale, without regard to their application or purpose. The Court does not reach the merits of plaintiff's constitutional claims as balanced against the Government's proffered justifications for restrictions on employee–press contact. The facts at bar neither demand nor allow such a judgment when narrower legal grounds are available, especially when a question of constitutionality is involved. *Cf. Roberts v. Austin,* 632 F.2d 1202 (5th Cir. 1980). Certainly there remain serious doubts whether § 6.03 operates as a "prior restraint" at all, as that term is properly understood, *cf. Bernard v. Gulf Oil, supra,* at 467–71, given the lack of penal or disciplinary sanctions in the Memorandum, *cf. International Society for Krishna Consciousness of Atlanta v. Eaves,* 601 F.2d 809, 823–4, 832–3 (5th Cir. 1979), and given the fact that plaintiff himself was not restrained from approaching the press in the beginning.

 Of course, federal courts will review allegedly unconstitutional regulations on an anticipatory basis where there exists a reasonable prospect of enforcement. *Cf. Hershey, supra; Eaves, supra; Let's Help Florida v. McCrary*, 621 F.2d 195 (5th Cir. 1980). As the *Hershey* court pointed out, the very notion of verifiable harm in the context of First Amendment "chill" is problematic, since the harm occurs through *failure* to speak out and exercise protected rights of expression. 412 F.2d at 1111. If courts are to adjudicate claims based on other than a wholly subjective apprehension of restraint, however, there must exist some focused context for decision, lest an opinion be wholly advisory. The government urges that plaintiff's claim must fail for lack of exhaustion of administrative remedies. Plaintiff here has not simply failed to exhaust his administrative remedies, he has not even waited to learn if management of the Jacksonville District Office ever intended to enforce § 6.03 against him. The third of the *Hershey* criteria for assessing First Amendment "chill," "the need for factual referents to properly define and narrow the issues," 412 F.2d at 1115, suggests that plaintiff's case must begin at the administrative level before the Court can intervene. Although declaratory relief is cumulative and does not strictly depend on lack of adequate legal remedies, 28 U.S.C. § 2201; 6A *Moore's Federal Practice* ¶ 57.10, a declaratory judgment remains an equitable remedy subject to the discretion of the court. The Court will deny relief until the facts are further developed.

The question of·whether the mere threat of enforcement by the agency confers ... standing is akin to the question of whether a controversy exists between the plaintiff and defendant in cases in which pre-enforcement relief is sought under an allegedly invalid statute. When the rule may or may not be enforced against the plaintiff, and the plaintiff is subjected to no detriment in the meanwhile, and any issues that he may wish to raise in connection with enforcement can be raised in the enforcement proceeding and will in

due course reach the courts upon review, the plaintiff may not anticipate the controversy by seeking declaratory relief. *Id.*, ¶ 57.16 at 57–163; *cf. Rhodes v. United States*, 574 F.2d 1179, 1181 (5th Cir. 1978); *McClendon v. Jackson Television*, 603 F.2d 1174, 1177 (5th Cir. 1979).

On the basis of the foregoing, the Court shall on this date dismiss this action pursuant to Rule 12(h)(3), F.R.Civ.P.